UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY F. DESLAURIERS, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Civil No. 07-184-B-W |
| | ) | |
| MICHAEL CHERTOFF, Secretary | ) | |
| of the United States Department of | ) | |
| Homeland Security | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Jeffrey Deslauriers filed this complaint against Michael Chertoff, the former Secretary of the United States Department of Homeland Security. Deslauriers claims that he was the victim of age discrimination under the Age Discrimination in Employment Act (ADEA) when he was not selected as a Lead Border Patrol Agent (LBPA) when he was forty-one years old and the candidate selected was thirty-six. Deslauriers also brings a retaliation claim, citing the fact that, after he commenced Equal Employment Opportunity proceedings vis-à-vis his non-selection for the position, he was not chosen for a sought-after eighteen-week special posting in Washington, D.C. The United States[1] has filed a motion for summary judgment. (Doc. No. 35.) This matter was referred to me by District Court Judge Woodcock for a recommended decision. Based on the following discussion I recommend that the Court deny the motion as to both counts.

*Discussion*

**A.    SUMMARY JUDGMENT STANDARD**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

---

[1]    I refer to the defendant as the United States, rather than Chertoff or the Department of Homeland Security, in this recommended decision.

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "In the

lexicon of Rule 56, 'genuine' connotes that the evidence on the point is such that a reasonable

jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving

party, and 'material' connotes that a contested fact has the potential to alter the outcome of the

suit under the governing law if the controversy over it is resolved satisfactorily to the

nonmovant."  Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) (quoting United States v. One

Parcel of Real Property (Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200, 204 (1st

Cir.1992)).  I "draw the relevant facts from the summary judgment record and rehearse them in

the light most flattering to" Deslauriers.  Bergeron v. Cabral, __ F.3d __, __, 2009 WL 580795, 1

(1st Cir. Mar. 9, 2009) (citing Cox v. Hainey, 391 F.3d 25, 27 (1st Cir.2004)).

 A Panel of the First Circuit Court of Appeals recently issued a decision of significant

importance to trial courts addressing employment claims of this ilk that I feel must be

incorporated into the summary judgment standard for this case.  In Chadwick v. Wellpoint, Inc.,

__ F.3d __,  2009 WL 782822 (1st Cir. Mar. 26, 2009) the First Circuit rejected, with respect to

a Title VII employment discrimination case, the suggestion that a plaintiff must have explicit

evidence of discrimination to survive summary judgment.  Chadwick, 2009 WL 782822 at *6.

This onus, the Panel opined "would undermine the concept of proof by circumstantial evidence,

and would make it exceedingly difficult to prove most sex discrimination cases today."  Id.

(citing Thomas v. Eastman Kodak Co., 183 F.3d 38,  58 n. 12 (1st Cir. 1999) for the proposition

that the use of circumstantial proof of discrimination is all the more important because 'smoking

gun' evidence is rarely found in the current sophisticated employment world).  The Panel noted

"that circumstantial evidence is not necessarily less probative than direct evidence."  Id. at *6, n.

9 (citing Desert Palace Inc. v. Costa, 539 U.S. 90,100 (2003)).  And the Panel cautioned that "at

2

summary judgment [the Court does] not decide which explanation for the non-promotion is most convincing, but only whether [the plaintiff] has presented sufficient evidence regarding [his or] her explanation." Id. at *7 n. 11 (citing Thomas, 183 F.3d at 61).  I conclude that this recent summary judgment caution is applicable to both counts of Deslauriers's complaint, even though, as explained below, the substantive law and facts pertinent to the retaliation claim are not necessarily joined at the hip with the factual and legal basis for the ADEA employment discrimination claim.

**B.      THE SUBSTANTIVE LEGAL STANDARDS**

**1.      Age Discrimination**

Section 633a(a) of title 29 provides that  personnel actions affecting federal employees who are at least 40 years of age "shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a).  In Gomez-Perez v. Potter the United States Supreme Court observed that "Congress decided not to pattern 29 U.S.C. § 633a(a) after § 623(a)" (which contains a list of specific prohibited practices) "but instead to enact a broad, general ban on 'discrimination based on age[.]' " __ U.S.__,__ 128 S.Ct. 1931, 1941 ( May 27, 2008).  "The ADEA federal-sector provision was patterned 'directly after' Title VII's federal-sector discrimination ban." Id. at 1940 (quoting Lehman v. Nakshian, 453 U.S. 156, 167, n. 15 (1981)).[2]

"Where, as here, there is no 'smoking gun' evidence of discrimination," Deslauriers, "can use the familiar McDonnell Douglas burden shifting framework to meet his ultimate burden of proving that he was denied promotions due to his age." Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 219 (1st Cir. 2008) (citing Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 478

---

[2]      The United States prefaces its discussion of this count with a citation to 29 U.S.C. § 623.  (Mot. Summ. J. at 4) and Deslauriers does as well (Resp. Mot. Summ. J. at 9-10).

(1st Cir.1993), citing, in turn, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)). Deslauriers "bears the initial burden of making out a prima facie case of age discrimination. To do so, he must show: 1) he was at least 40 years old at the time of the discrimination; 2) he was qualified for the position; 3) he was denied the promotion; and 4) [the United States] filled the position with a younger person of similar qualifications." Id. (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir.1991)). "This 'modest showing' is sufficient to raise an inference of discrimination." Id. (quoting Rathbun, 361 F.3d at 71.) The burden then shifts to the United States "to articulate a legitimate, non-discriminatory reason for its decisions." Id. (citing Currier v. United Techs. Corp., 393 F.3d 246, 254 (1st Cir.2004)). If the United States accomplishes this, Deslauriers must generate evidence that the United States' "proffered reasons are a pretext for age discrimination." Id. (citing Hoffman v. Applicators Sales and Service, Inc., 439 F.3d 9, 17 (1st Cir.2006)". " '[T]he ultimate burden on the plaintiff is to show that discrimination is the or a motivating factor, a showing which may, but need not be, inferred, depending on the facts, from the showing of pretext.' " Id. (quoting Hoffman, 439 F.3d at 17, in turn citing Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir.2000)). The United States does not dispute that Deslauriers can make out a prima facie case under the McDonnell Douglas standard. (Mot. Summ. J. at 5.) And Deslauriers concedes that the United States "has articulated a legitimate (albeit shifting) reason for Agent Podschlne's selection" meaning that the "real issue here is pretext." (Resp. Mot. Summ. J. at 11.) This agreement simplifies the legal analysis required regarding the age discrimination count.

## 2.   **Employment Retaliation**

Deslauriers maintains that in not assigning him to the off-sector detail position the United States violated 42 U.S.C. § 2000e-16b and 29 U.S.C. § 623(d). (Compl. ¶ 34.) However,

4

Gomez-Perez stressed that its "holding that the ADEA prohibits retaliation against federal-sector employees is not in any way based on § 623(d)."  Gomez-Perez, 128 S.Ct. at 1941.[3]  The Supreme Court's "conclusion, instead, is based squarely on § 633a(a) (2000 ed., Supp. V) itself, 'unaffected by other sections' of the Act."  Id. (quoting Lehman, 453 U.S. at 168); see also id. at 1935 ("The question before us is whether a federal employee who is a victim of retaliation due to the filing of a complaint of age discrimination may assert a claim under the federal-sector provision of the Age Discrimination in Employment Act of 1967 (ADEA), as added, 88 Stat. 74, and amended, 29 U.S.C. § 633a(a) (2000 ed., Supp. V).  We hold that such a claim is authorized.").

The parties assume that precedents addressing Title VII's and FMLA's anti-retaliation provisions addressing private employer/employee relationships are applicable to this ADEA federal employee retaliation dispute.  (See Mot. Summ. J. at 10-11; Resp. Mot. Summ. J. at 20-21; Reply Mem. at 6-7.)  See, e.g., Breneisen v. Motorola, Inc., 512 F.3d 972 (7th Cir. 2008); Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1044 -45 (8th Cir. 2007); see also Allen v. Wal-Mart Stores, Inc., Civ. No. 06-137-B-W, 2008 WL 1803779, 16 -18  (D. Me. Apr. 18, 2008)

---

[3]      Section 623(d) of title 29 provides:
            (d) Opposition to unlawful practices; participation in investigations, proceedings, or litigation

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C.A. § 623(d).

(recommended decision), aff'd, 2008 WL 1990827 (D. Me. May 06, 2008)(Title VII and ADEA

theories).[4]

      With respect to Title VII private employee/employers retaliation disputes, the United

States Supreme Court clarified in Burlington Northern and Santa Fe Ry. Co. v. White:

> The scope of the anti-retaliation provision extends beyond workplace-
> related or employment-related retaliatory acts and harm. We therefore reject the
> standards applied in the Courts of Appeals that have treated the anti-retaliation
> provision as forbidding the same conduct prohibited by the anti-discrimination
> provision and that have limited actionable retaliation to so-called "ultimate
> employment decisions."
>
> The anti-retaliation provision protects an individual not from all
> retaliation, but from retaliation that produces an injury or harm. … In our view, a
> plaintiff must show that a reasonable employee would have found the challenged
> action materially adverse, "which in this context means it well might have
> 'dissuaded a reasonable worker from making or supporting a charge of
> discrimination.' " Rochon [v. Gonzales], 438 F.3d [1211,] 1219 [(D.C.Cir. 2006)]
> (quoting Washington v. [Illinois Dep't of Revenue],420 F.3d  [658,] 662 [(7th Cir.
> 2005).
>
> We speak of material adversity because we believe it is important to
> separate significant from trivial harms.

548 U.S. 53, 67-68 (2006).  There is no question that this is an objective standard.  Id. at

68-69.  And there is no question that this standard applies to ADEA retaliation claims in

the context of private employee/employer disputes.  See, e.g., Franco v. Glaxosmithkline,

Civ. No. 06-1781 (JAG), 2009 WL 702221, 28-30 (D.P.R. Mar. 11, 2009); Reyes

Guadalupe v. Casas Criollas, 597 F.Supp. 2d 255, 261 (D.P.R. 2008).

      However the majority in Gomez-Perez, expressly distinguished Burlington North from

the AEDA public-employee retaliation as discrimination analysis premised on Sullivan v. Little

Hunting Park, Inc., 396 U.S. 229 (1969)'s 42 U.S.C. § 1982 analysis and Jackson v. Birmingham

---

[4]    For instance, the United States cites to Brown v. Brody, 199 F.3d 446, 457 (D. C. Cir. 1999).  (See Mot.
Summ. J. at 10.)  Since that case the D.C. Circuit has recognized that the Supreme Court's Burlington N. & Santa Fe
Ry. Co. v. White, 548 U.S. 53 (2006) abrogated the Brown 'adverse employment action' requirement apropos
retaliation, as opposed to discrimination, claims.  See Steele v. Schafer, 535 F.3d 689, 695-96 (D.C. Cir. 2008).

Board of Education, 544 U.S. 167 (2005)'s Title IX interpretation.  See 128 S.Ct at 1937 n.1.

See also CBOCS West, Inc. v. Humphries, __ U.S. __, __, 128 S. Ct. 1951, 1955-58 (2008) (42

U.S.C. § 1981 retaliation claim).  For its part the First Circuit has clearly indicated that federal

employees can pursue retaliation claims under Title VII, see DeCaire v. Mukasey, 530 F.3d 1,19

(1st Cir. 2008); Mariani-Colon v. Department of Homeland Sec. ex rel. Chertoff, 511 F.3d 216,

223 -24 (1st Cir. 2007); Calero-Cerezo v. U.S. Dep't Justice, 355 F.3d 6,  25 (1st Cir. 2004).

And in DeCaire, addressing a federal employee's Title VII retaliation claim, the First Circuit

applied Burlington North:

> The Supreme Court has explained how Title VII's substantive provision
> differs from this anti-retaliation provision: "The substantive provision seeks to
> prevent injury to individuals based on who they are, i.e., their status. The anti-
> retaliation provision seeks to prevent harm to individuals based on what they do,
> i.e., their conduct." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53
> (2006).

530 F.3d  at 19; id.  ("It therefore does not matter for retaliation purposes whether [the federal

employer defendant] would have treated a male deputy the same way he treated [the plaintiff].

The relevant question is whether [the defendant] was retaliating against [the plaintiff] for filing a

complaint, not whether he was motivated by gender bias at the time."); accord Jones v.

Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009); Buckley v. Mukasey, 538 F.3d 306, 315 n.11 (4th

Cir. 2008); Lapka v. Chertoff, 517 F.3d 974, 985-86 (7th Cir. 2008); Patterson v. Johnson, 505

F.3d 1296, 1299 (D.C. Cir. 2007); Caldwell v. Johnson, No. 05-1706, 289 Fed.Appx. 579, 590-

92 (4th Cir. Aug. 15, 2008) (unpublished); Twisdale v. Paulson, 595 F.Supp.2d 686, 694 -

700 (S.D.W. Va. 2009).[5]  See also Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 n. 9 (1st

---

[5]     The Title VII federal employee provision provides "All personnel actions affecting employees or applicants
for employment … shall be made free from any discrimination based on race, color, religion, sex, or national
origin." 42 U.S.C. § 2000e-16(a).  Like the ADEA this does not incorporate the anti-retaliation provision that is the
statutory basis for these Title VII private employee/employer retaliation cases.  See Gomez-Perez, 128 S.Ct. at 1941

Cir. 1996) ("The analytical framework for ADEA discrimination and retaliation cases was patterned after the framework for Title VII cases, and our precedents are largely interchangeable. See, e.g., Hazel v. U.S. Postmaster General, 7 F.3d 1, 3-4 (1st Cir.1993) (applying McDonnell Douglas framework and a unified retaliation analysis to claims under both the ADEA and Title VII).").

The parties also agree that the McDonnell Douglas burden shifting formula applies to the retaliation claim as well as the discrimination claim. See Mariani-Colon, 511 F.3d at 223 ("Title VII retaliation claims also proceed under the burden-shifting framework laid down in McDonnell Douglas."); see also Jones, 557 F.3d at 677 ("Both Title VII and the ADEA prohibit the federal government from retaliating against employees who complain of employment discrimination. Montgomery v. Chao, 546 F.3d 703, 706 (D.C.Cir.2008) (Title VII); Gomez-Perez v. Potter, --- U.S. ----, 128 S.Ct. 1931, 1943 (2008) (ADEA). Whether brought under Title VII or the ADEA, retaliation claims based on circumstantial evidence--like Jones's--trigger the familiar burden-shifting framework of McDonnell Douglas.").

So, assuming that this analysis applies in the federal-employee AEDA context after Burlington North and Gomez-Perez, Mesnick v. General Electric Corp. remains controlling in this circuit. Thus:

> Absent direct evidence, the McDonnell Douglas burden-shifting
> framework remains the option of choice in retaliation cases, albeit with slight
> modifications. Under the applicable model, the plaintiff must make a prima facie

---

n.14 ("While the federal-sector provision of Title VII does not incorporate § 2000e-3(a), the federal-sector provision of Title VII does incorporate a remedial provision, § 2000e-5(g)(2)(A), that authorizes relief for a violation of § 2000-3(a). Petitioner argues that this remedial provision shows that Congress meant for the Title VII federal-sector provision's broad prohibition of "discrimination based on race, color, religion, sex, or national origin" to reach retaliation because otherwise there would be no provision banning retaliation in the federal sector and thus no way in which relief for retaliation could be awarded. Brief for Petitioner 20. The Federal Government, however, has declined to take a position on the question whether Title VII bans retaliation in federal employment, see Tr. of Oral Arg. 31, and that issue is not before us in this case.").

showing that (i) he engaged in ADEA-protected conduct, (ii) he was thereafter subjected to an adverse employment action, and (iii) a causal connection existed between the protected conduct and the adverse action. See Connell v. Bank of Boston, 924 F.2d 1169, 1179 (1st Cir.), cert. denied, 501 U.S. 1218 (1991); Petitti, 909 F.2d at 33.[6] The fact that a plaintiff eventually proves unable to establish that the employer violated the ADEA in the first instance is not fatal to his prima facie case of retaliation. It is enough that the plaintiff had a reasonable, good-faith belief that a violation occurred; that he acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it. See Petitti, 909 F.2d at 33; Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988).

Once a prima facie case is delineated, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. See McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir.1991); Petitti, 909 F.2d at 34. If this is accomplished, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation for the employee's opposition to a practice cast into doubt by the ADEA. See Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1254 (2d Cir.1987); see also EEOC v. Hacienda Hotel, 881 F.2d 1504, 1514 (9th Cir.1989) (Title VII retaliation case); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989) (same). As in the discrimination context proper, courts confronted by summary judgment motions must at this point focus on the ultimate question, scrapping the burden-shifting framework in favor of considering the evidence as a whole. See supra pp. 824-825; see also Cerberonics, 871 F.2d at 458 (in determining whether it is appropriate to take a retaliation case from the jury, a reviewing court's focus must be on "the evidence as a whole"). Thus, the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question.

950 F.2d 816, 827 (1st Cir. 1991).

The Mesnick Panel continued:

There are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles. These include, but are not limited to, evidence of differential treatment in the workplace, see, e.g., Sumner v. United States Postal Serv., 899 F.2d 203, 210 (2d Cir.1990); Dominic, 822 F.2d at 1254-55, statistical evidence showing disparate treatment, see, e.g., McDonnell Douglas, 411 U.S. at 805, temporal proximity of an employee's protected activity to an employer's

---

[6]    See also Blackie, 75 F.3d at 722 -23.  ("The third element is of pivotal importance in this case. Under it, a plaintiff must proffer evidence from which a reasonable factfinder could infer that the employer retaliated against him for engaging in the protected activity. See Mesnick, 950 F.2d at 828. In other words, the record must enable the trier of fact plausibly to find that "a causal connection existed *between the protected conduct* and *the adverse action*.' Id. at 827 (emphasis supplied) (citing Connell, 924 F.2d at 1179).").

adverse action, see, e.g., Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 202 (1st Cir.1987); Sumner, 899 F.2d at 209, and comments by the employer which intimate a retaliatory mindset. Whatever the sources of his proof, a plaintiff, in order to survive judgment as a matter of law, must present evidence from which a reasonable jury could infer that the employer retaliated against him for engaging in ADEA-protected activity. Petitti, 909 F.2d at 33; Cerberonics, 871 F.2d at 458.

Id. at 828; see also DeCaire, 530 F.3d at 20.  As Deslauriers does not have direct evidence of a retaliatory intent regarding his non-selection for a detail he coveted he is relying on circumstantial evidence to get him past the summary judgment stage of this litigation.

## C.    FACTS

### 1.    Background of the Agency

There is no dispute as to the following.  Prior to 2003, the U.S. Border Patrol fell under the Immigration and Naturalization Service. In 2003, after the Department of Homeland Security was created, Border Patrol merged into a new agency, called U.S. Customs and Border Protection.  Border Patrol is a distinct office within CBP.  Border Patrol is organized into various Sectors across the northern and southern borders of the United States.  One such Sector is Houlton Sector, which has responsibility for enforcing immigration and other applicable laws in the State of Maine.  (SMF ¶ 1; Resp. SMF ¶ 1.)

### 2.    Organization of Houlton Sector

Houlton Sector is headquartered in Hodgdon, Maine.  Within the Sector are six Stations: Rangeley, Jackman, Van Buren, Fort Fairfield, Houlton, and Calais.  (SMF ¶ 2; Resp. SMF ¶ 2.) A Chief Patrol Agent (CPA), the top manager in Houlton Sector, has overall responsibility for operations and personnel within the Sector.  A Deputy Chief Patrol Agent (DCPA) directly reports to the Chief Patrol Agent and serves as second in command.  When the CPA is away from the Sector, the DCPA acts in his place. Four Assistant Chief Patrol Agents (ACPA) report

to the DCPA.  These ACPAs serve as the managers for various programs and Stations. Each

Station is managed by a Patrol Agent in Charge (PAIC).  One to three Supervisory Border Patrol

Agents (SBPA) may report to the PAIC.  The SBPAs directly supervise multiple Border Patrol

Agents (BPA).  (SMF ¶ 3; Resp. SMF ¶ 3.)

3.     **Deslauriers's Employment with the Agency**

Deslauriers was born on October 24, 1963.  (SMF ¶ 4; Resp. SMF ¶ 4.)[7]  He has been

employed by CBP, or its predecessor, INS, for approximately 20 years.  At all relevant times to

the complaint he served as a Border Patrol Agent, GS-11, at Calais Station.  (SMF ¶ 5; Resp.

SMF ¶ 5.)  He has worked for the U.S. Border Patrol Program/DHS since 1987 and, for 17 years

up until July 2008, he served as a Senior Patrol Agent in the Houlton Sector in Northern Maine.

At the time he applied for the promotion to LBPA, he had 18 years of service with DHS and 17

years of service in the Houlton sector in Maine.  (SAMF ¶ 2; Resp. SAMF ¶ 2.)

Deslauriers has a stellar work performance history; he has been rated as excellent to

outstanding, and has been issued numerous honors and awards, as follows:

    April 2003 Outstanding rating (USBP Academy-Charleston)
    April 2002 Outstanding rating
    January 2001 Employee of the month
    April 2001 Outstanding rating and S.S.P. award
    April 2000 Outstanding rating
    August 1999 Employee of the month
    April 1999 Outstanding rating
    April 1997 Outstanding rating
    October 1996 Outstanding rating (USBP Academy-Glynco)
    June 1995 S.S.P. and cash award
    June 1994 S.S.P. and cash award
    April 1993 Outstanding rating
    June 1991 S.S.P. and cash award
    April 1991 Outstanding rating.

---

[7]     The parties do not dispute that Deslauriers is 44-years-old (SAMF ¶ 1; Resp. SAMF ¶ 1), but this
calculation is incorrect as of the date the factual statements were signed.

(SAMF ¶ 3; Resp. SAMF ¶ 3.)  Deslauriers states that when he was detailed to be Acting Lead

Border Patrol Agent, he worked under Patrol Agent in Charge for the Houlton Sector

Intelligence Unit Charles Sill who told Deslauriers that his work was "outstanding" and that he

was "impressed" with his reports.  (SAMF ¶ 4; Deslauriers Decl. ¶5; Sill EEO Decl. ¶5.) [8]

### 4.      Reorganization of the Houlton Sector Intelligence Unit

Included in the various programs operated within Houlton Sector is the Sector

Intelligence Unit.  The purpose of the SIU is to analyze information and detect patterns in order

to assist the Border Patrol in carrying out its mission.  For many years, the SIU consisted of one

Intelligence Agent for the entire Sector.  However, in 2005, Houlton Sector reorganized the SIU

pursuant to an agency-wide initiative to expand the intelligence capabilities of the Border Patrol.

(SMF ¶ 6; Resp. SMF ¶ 6.)  Under this reorganization, several new positions were created.  A

PAIC for Intel was stationed at Houlton Sector Headquarters and responsible for day to day

management of the SIU.  A Lead Border Patrol Agent, GS-12, was placed at each of the six

Stations.  (SMF ¶ 7; Resp. SMF ¶ 7.)  LBPAs are responsible for collecting information from

various sources, analyzing that information to detect patterns and develop intelligence, and

writing reports documenting their findings, which may be distributed to BPAs in the field or to

high ranking agency officials if the report is deemed of significant importance.  The LBPA

position is a non-uniform position.  (SMF ¶ 8; Resp. SMF ¶ 8.)

From February through June 2005, DHS detailed Agent Deslauriers to serve as the first

Acting LBPA at the Calais Border Patrol Station before filling the position permanently.  (SAMF

¶ 40; Resp. SAMF ¶ 40.)  Deslauriers adds that when he was assigned acting LBPA, there was

---

[8]      The United States offers a qualification of little moment, pointing out that he relayed his comment that
Deslauriers's work was outstanding" in an email that I said "continue to do the outstanding work you have been
doing." (Resp. SAMF ¶ 4; Sill Decl., Ex. A at 2; Deslauriers Decl., Ex. D.)

no developed intelligence unit.  His duties therefore were greater in scope than what is described, as he was responsible for starting the unit from scratch.  (Resp. SMF ¶ 8; Deslauriers Decl. ¶ 11.)  Until permanent positions could be filled, individuals within the Sector were assigned to serve in an "acting" capacity.  Charles Sill received the assignment to serve as the acting PAIC for Intel in or around February 2005.  Around the same time, Deslauriers received the assignment to serve as the acting LBPA at Calais Station.  He served in this capacity until June 2005.  At this time, another BPA, Marc Podschlne rotated into this acting role.  (SMF ¶ 9; Resp. SMF ¶ 9.)

Deslauriers represents that he was charged with opening the intelligence unit, contacting other law enforcement agencies to introduce and explain the function of the unit, and break the new ground.  (SAMF ¶ 41; Deslauriers Decl. at ¶11.)  In addition to the groundwork to establish the intelligence unit at the Calais Border Patrol Station, to the extent possible Agent Deslauriers did some investigative work, but not nearly as much as he otherwise would have been able to do if the unit had already been open and established.  (SAMF ¶ 42; Deslauriers Decl. at ¶12.)  Agent Podschlne followed Agent Deslauriers in the Acting LBPA position.  By that time, the intelligence unit was open and established, and investigations were already under way as a result of Agent Deslauriers's work.  Agent Podschlne had the benefit of this ground work, and far more time to devote to investigations.  (SAMF ¶ 43; Deslauriers Decl. at ¶13.)

The United States responds by indicating that, as the first agent to serve in this acting role, Deslauriers did have responsibilities involving contacting other law enforcement agencies within the Calais area of responsibility to explain the newly re-designed intelligence unit, but nevertheless, he reported to a supervisor during this time; he was not "on his own."  (Resp. SAMF ¶ 41; Deslauriers Decl. ¶ 5.)  Further, Deslauriers was not the only acting LBPA for the entire Houlton Sector Intelligence Unit.  (Resp. SAMF ¶ 41; Richardson Decl. ¶ 4.)  It further

13

maintains that Deslauriers's Declaration fails to provide a foundation to make assertions about the work performed by Podschlne as Acting LBPA.  Nor is it material that Deslauriers has an opinion about the relative advantage or disadvantage of working in the position first or second, when the issue in this case involves the actions and mindset of management (regarding the relative qualifications of Deslauriers and Podschlne and their ability to generate actionable intelligence), about which Deslauriers is not competent to testify.  (Resp. SAMF ¶¶ 42, 43.)

There is no dispute that while serving as the acting LBPA, both Deslauriers and Podschlne drafted intelligence reports, and generally carried out the LBPA duties and responsibilities.  During their rotation, they reported to acting PAIC Sill, who determined each performed the job well.  (SMF ¶ 10; Resp. SMF 10.)[9]  Deslauriers adds that he had broader duties than Agent Podschlne when they each served as acting LBPAs as he served first, when the unit was being developed from scratch, while Agent Podschlne took over after the unit was up and running.  (Resp. SMF ¶ 10; Deslauriers Decl. ¶11.)  In addition, he stresses, Sill told Deslauriers his work was "outstanding."  Performance evaluations in this work setting specifically reserve the term "outstanding" for only the very best performers – where the work is even better than "excellent." (Resp. SMF ¶ 10; Deslauriers Decl.¶¶4-5.)

### 5.    LBPA Announcement and Initial Review of Applications

There is no dispute as to the following. (SMF ¶ 11-16; Resp. SMF ¶ 11-16.)  On July 21, 2005, Vacancy Announcement WAS-406-478-TMW was posted, advertising the opening of one vacancy at Calais Station for the position of LBPA, GS-12. Only CBP employees within the local commuting area were eligible to apply.  As provided in the announcement, the minimum

---

[9]    Deslauriers reserves the right to cross examine Sill on this point. (Resp. SMF ¶ 10.)

qualification for the position was one year of service at the GS-11 level. At or around the same time, vacancy announcements for one LBPA, GS-12, position were issued for the other five Stations within Houlton Sector. The Washington Service Center, a division within the Office of Human Resources Management for CBP, received the applications for the vacancy in Calais.[10] Pursuant to the agency's Merit Promotion Plan, an HR Specialist evaluated the applications and determined a numeric score for each application. The HR Specialist then created a Merit Promotion Certificate of Eligibles for qualifying applicants, listing their names in rank order. The Certificate contained three names: Deslauriers, Matthew Whittaker, and Lesley Miller, in that order.

The HR Specialist also created a Non-Competitive Candidate Referral List. A non-competitive list is created for applicants who have already permanently held the grade level for which they are applying. There was one name on this list: Marc Podschlne. Both the Merit Promotion Certificate of Eligibles and the Non-Competitive Candidate Referral List, along with the accompanying applications, were referred to the acting Chief Patrol Agent for Houlton Sector, Matthew Zetts. Acting CPA Zetts was the designated selecting official for this vacancy, as well as the other five LBPA vacancies in Houlton Sector. Under the agency's Merit Promotion Plan, acting CPA Zetts could select any name from the lists he received.

According to Deslauriers, all of the candidates for the Calais Border Patrol Station LBPA position, including Agent Deslauriers, were over the age of 40 except one: Agent Marc Podschlne. (SAMF ¶ 7; Leaman Decl. ¶ 6.) Of all the applicants for the promotion to LBPA in

---

[10]     There is no dispute that in August 2005, Agent Deslauriers submitted an application for a Lead Border Patrol Agent ("LBPA") position at the Calais Border Patrol Station, Houlton Sector. (SAMF ¶ 5; Resp. SAMF ¶ 5.) Three other Border Patrol Agents bid on the LBPA position at the Calais Border Patrol Station (SAMF ¶ 6) and were determined by Human Resources to be eligible for selection (Resp. SAMF ¶ 6).

Calais, Agent Podschlne was the youngest.  At the time, Agent Deslauriers was almost 42 years old and Agent Podschlne was 36.  (SAMF ¶ 8; Leaman Decl. ¶ 6.)  Deslauriers contends that Podschlne has a younger looking face, while he has graying hair.  (SAMF ¶ 9; Deslauriers Dep. at 120:6-8.)  Deslauriers's application for the promotion to the LBPA position identifies his years of service, which signaled his older age. (SAMF ¶ 10; Deslauriers Decl. ¶6.)

 With regards to these age-related additional statements, the United States responds as follows.  Of the four eligible candidates for the Calais LBPA position, two were 41, one was 49, and one was 36 (selectee Marc Podschlne).  (Resp. SAMF ¶ 7; Leaman Decl. ¶ 6, Table 1.)  At the time of selection, Deslauriers was approximately 41 years and 11 months, and Podschlne was approximately 36 years and 7 months, which is a difference of 5 and a third years.  (Resp. SAMF ¶ 8; Leaman Decl. ¶9)  Citing Federal Rule of Evidence 701, the United States insists that Deslauriers's assertion that Podschlne has a "younger looking face" is a subjective judgment or opinion, not a factual statement, which is not "helpful" or otherwise material for the purpose of this summary judgment motion.  (Resp. SAMF ¶ [9].)  And the United States maintains that at the time of the selection, the decision-maker (Zetts) did not know Deslauriers's age (Resp. SAMF ¶ 10; Zetts EEO Decl. 5 of 17; Docket #37-2).  Likewise, the person who recommended the selection (Richardson) did not know his age.  (Resp. SAMF ¶ 10; Richardson Decl. ¶ 2.).  Although Deslauriers's application for the LBPA position stated that he had been a Border Patrol Agent since August 10, 1987, the application does not include any statement of date of birth.  (Resp. SAMF ¶ 10; Deslauriers Decl., Ex. E.)[11]

---

[11]  In pure argument, the United States argues: An employee's age is "analytically distinct" from years of service.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993).  Plaintiff's Declaration also lacks foundation to assert how the selecting and recommending officials perceived his application. (Resp. SAMF ¶ 10.)

6.      **Evaluation of Candidates by Houlton Sector**

There is also no dispute that the following statements are supported by the record

citations.  (SMF ¶¶ 17-21; Resp. SMF ¶ 17-21.)  Upon receipt of the lists for the six Stations,

acting CPA Zetts instructed acting DCPA Roland Richardson to review the applications and

provide recommendations on the top two applicants for each Station.  In Houlton Sector, the

practice was to perform an evaluation of the applications, independent of the original Human

Resources evaluation, in order to determine who should be selected for interviews.  To evaluate

applications, Houlton Sector used the "Kepner-Tregoe" (KT) rating system, which is a method of

ranking candidates in various categories.  A full KT entails assigning scores to each applicant in

each category.  Acting DCPA Richardson created a KT evaluation sheet consisting of eight

categories: name, current duty station, Border Patrol experience, intelligence experience, other

related experience, informant development/use, writing/presentations, computer systems

familiarity, and formal education.  For the six LBPA vacancies, acting Richardson did not

perform a full KT, that is, he did not assign numeric scores for each category.  Rather, for each

application, he simply filled in information for the eight categories based on the information

provided in the application.  Richardson then reviewed all completed KT evaluations sheets and

determined whom he believed were the top two candidates for each Station.  For Calais Station,

acting Richardson determined Deslauriers and Podschlne were the top two candidates.[12]

Deslauriers adds the following qualifications to this sequence of statements.  Richardson

deviated from regular practice by failing to assign numeric scores for each category.  He

explained:  "Generally… [c]andidates receive numeric scores for each item on the list and the

---

[12]      Not for the first or last time Deslauriers reserves the right to cross-examine the witnesses on these factual
issues.  From here on out I will not make special note of the reservation of rights should the case go to trial.

top scoring candidates are selected for interviews.  For these LBPA positions, the acting CPA

told me a full KT was not required."  (Resp. SMF ¶ 20; SAMF ¶ 10A; Richardson Decl. ¶ 7.)

The United States counters that Deslauriers has offered no evidentiary support for his assertion

that Richardson deviated from regular practice; rather Richardson explained in his declaration

that all candidates for the LBPA position in Calais were evaluated using the same KT rating

sheets.  (Resp. SAMF ¶ 10A; Richardson Decl. ¶¶ 7-9.)

        The United States indicates that in evaluating the applications for Calais Station,

Richardson noted Podschlne was placed on a separate list; however, that placement carried no

weight in his review of Podschlne's application.  (SMF ¶ 22; Richardson Dec. ¶ 8.)  Deslauriers

responds that whether the misplacement of Podschlne on the non-competitive list was given any

weight in Richardson's review of Podschlne is a material fact in dispute in that Podschlne's

placement on the non-competitive list signaled that he had experience working in a permanent

GS-12 position or higher, which suggested he had greater experience.  (Resp. SMF ¶ 22; Zetts

Decl. ¶ 7; Seiner Decl. ¶ 5.)  Placing Podschlne on the non-competitive list was an error because

he never held a permanent GS-12 position or higher.  (Resp. SMF ¶ 22; Seiner Decl. ¶ 7.)  The

appropriate protocol to remedy such an error would have been to cancel the noncompetitive list

and reissue it, so Podschlne appeared on the competitive list with the other applicants, but this

was not done. (Resp. SMF ¶ 22; Seiner Decl. ¶ 9.)

        There is no dispute that Richardson provided to Zetts his recommendations on the top

two candidates for each station.  (SMF ¶ 23; Resp. SMF ¶ 23.)

**7.    Interview Process**

        Again, there is no dispute as to the following.  (SMF ¶¶ 24-29; Resp.SMF¶ 24-29.)  Zetts

accepted Richardson's recommendations and instructed his staff to schedule interviews for those

12 candidates, including Deslauriers and Podschlne for Calais Station.  Zetts requested

Richardson and ACPA Monte Bennett to sit in on the interviews with him.  Prior to any

interviews being held, a list of questions to be asked of the candidates was developed.

The United States interviewed only Agent Deslauriers and Agent Podschlne for the

LBPA position for the Calais Unit; the other two applicants who were over age 40 were not

interviewed.  (SAMF ¶ 11; Resp. SAMF ¶ 11.)  At the time of their applications for this position,

Agent Deslauriers had 18 years of experience with DHS as compared to Agent Podschlne's

seven years.  (SAMF ¶ 12; Resp. SAMF ¶ 12.)

Deslauriers's interview took place on September 14, 2005.  Whether a candidate wore his

uniform or dress casual attire to the interview was of no significance to Zetts in his evaluation of

the candidates.  Richardson was not present for Deslauriers's interview, or any interview

scheduled that day.  Richardson was on sick leave September 14 and 15, 2005.[13]

Deslauriers complains that while all three of the final decision makers, Richardson,

Bennett, and Zetts, were present at Agent Podschlne's interview, only two of "the final decision

makers," Zetts and  Bennett, were present at Deslauriers's interview.  (SAMF ¶ 27; Zetts Decl. ¶

12.)  The United States responds that Richardson and Bennett were not the "final decision

makers"; instead, they were part of the interview panel.  Zetts, it insists, was the sole selecting

officer or "final decision maker."  (Resp. SAMF ¶ 27; Zetts Decl. ¶¶ 11, 5, 13.)

According to the United States, Zetts did not find it necessary to reschedule the

interviews due to Richardson's absence because he still had the benefit of one other interviewer,

Bennett, and because rescheduling could present logistical difficulties.  (SMF ¶ 30; Zetts Dec. ¶

12.)  In response, Deslauriers admits that the interview was not rescheduled, and in denial of the

---

[13]        (SAMF ¶ 28; Resp. SAMF ¶ 28.)

inference that the reason Agent Deslauriers's interview was not rescheduled was because Zetts had the benefit of one other interviewer and because rescheduling could present logistical difficulties, he speculates as follows without record citation:  Candidates applying for the LBPA position had to drive only approximately one and a half hours to attend the interview[14] and could have been contacted for rescheduling before they began the trip.  (Resp. SMF ¶ 30.)  He notes that there was no attempt to contact Deslauriers to postpone or reschedule the interview (SAMF ¶ 30;Resp. SAMF ¶ 30)  to a time when all three decision makers could be present.  (Id; Deslauriers Decl. ¶ 8; SAMF ¶ 30.)[15]  He argues that as a result of this irregularity, among others, an inference can be drawn that Zetts did not treat Deslauriers's application for the promotion to LBPA as seriously as others because he did not want to promote him due to his age.  (Resp. SMF ¶ 30.)

According to the United States, although a script of questions was developed for interviews, it would not have been uncommon for an interviewer to ask a follow-up question when the candidate did not provide a complete answer or raise a related issue in his response. (SMF ¶ 31; Zetts Dec. ¶ 11; Richardson Dec. ¶ 10; Resp. SAMF ¶ 32.)  This practice the United States describes as not being discriminatory.  (Resp. SAMF ¶ 32.)  Deslauriers responds that he objects to the inference that he may have been asked follow-up questions but not different questions altogether in this interview (Resp. SMF ¶ 31); he maintains that he was asked questions during the interview based on a completely different hypothetical (id.; Deslauriers

---

[14]    (SAMF ¶ 29; Resp. SAMF ¶ 29.)
[15]    As already noted the United States takes the position that Zetts was the only selecting official and he was present at both interviews; Richardson, like Bennett, was not a "decision maker."  (Resp. SAMF ¶ 30.)

Dep. at 52:21-25 - 53:1-6; SAMF ¶ 31.)[16]  In the cited portion of his deposition

Deslauriers recounts a casual debriefing he had with Chuck Sill and John Krause after his

interview during which Deslauriers indicated he was asked a question that involved facts similar

to a situation Deslauriers had encountered and Krause responded that he did not recall having

that sort of question addressed to him.  Deslauriers insists that asking candidates different

questions during the interview process deviated from regular practice, which was to ask all

candidates "the same set of questions, which had previously been developed."  (SAMF ¶ 32;

Zetts Decl. ¶ 11.)

For its part, the United States asserts that Deslauriers's representations about his

conversation with Krause is hearsay, immaterial, and lacks foundation.  (Resp. SAMF ¶ 31.)   It

argues Deslauriers offers no declaration from Krause and there is no evidence to confirm

whether or not Podschlne was asked the same question.  (Id.)  Moreover, the United States

observes, in his deposition, Deslauriers testified that he answered the question well.  (Resp.

SAMF ¶ 33; Deslauriers Dep. 54.)  In addition, the interview was not the deciding factor in the

selection; in describing reasons for choosing selectee Zetts makes no mention of interview.

(Resp. SAMF ¶ 33, Zetts Decl. Ex. A at  4.)

There is no summary judgment dispute that after the interviews, Zetts discussed the

individual candidates with Bennett and Richardson.  (SMF ¶ 32; Resp. SMF ¶ 32.)

---

[16]     In his statement of additional facts he reiterates his belief that he was given a whole different hypothetical
example to discuss, not mere follow-up questions. (SAMF ¶33; Deslauriers Dep. at 52:21-25 – 53:1-20.)

8.     **Review of Intelligence Reports**

In evaluating Deslauriers and Podschlne, Zetts and Richardson agreed both were strong candidates.  (SMF ¶ 33; Resp. SMF ¶ 33.)  To assist him in making his decision, Zetts requested a review of the intelligence reports written by Deslauriers and Podschlne.  (SMF ¶ 34; Resp. SMF ¶ 34.)  Richardson requested that Sill provide the intelligence reports drafted by Deslauriers and Podschlne.  (SMF ¶ 35; Resp. SMF ¶ 35.)  Zetts says the investigative reports for Deslauriers and Podschlne were reviewed for a period of two years preceding the LBPA selection.  (SAMF ¶ 37; Resp. SAMF ¶ 37.)  There is no dispute that the few intelligence reports selected by the United States in support of this motion were prepared when Podschlne and Deslauriers were Acting LBPA.  (SAMF ¶ 39; Resp. SAMF ¶ 39.)

Deslauriers offers the following qualification.  (Resp. SMF ¶ 34, 35.)  Zetts stated in his Declaration in the EEO process that "[d]uring the selection process the complainant's intelligence reports submitted in the two years prior to the selection were reviewed," not just for the period in 2005 when he was Acting LBPA.  (Zetts Decl. Ex. A., Zetts Unsworn EEOC Decl. at 6, Doc. No. 37-2.)  Richardson states that Zetts "requested a review of the intelligence reports written by Deslauriers and Podschlne during the time each served as acting LBPA."  (Richardson Decl. ¶ 12.)  That period of time was only for 2005, not for a two-year period as Zetts originally stated.  (Resp. SMF 35; SAMF ¶ 38; Deslauriers Decl. ¶ 10.)  The intelligence reports submitted by the United States in this action, which are attached to the Declaration of Charles Sill, were prepared in 2005, when Agents Deslauriers and Podschlne each served (at different times) as Acting LBPA.  ( Id.)  Deslauriers insists, thus, that these witnesses are inconsistent in their description of what specific intelligence reports were allegedly reviewed.  (Resp. SMF ¶ 35.)

22

There is agreement that there is record support for the following statements.  (SMF ¶¶ 36-38; Resp. SMF ¶¶ 36-38.)  Upon providing these reports, Richardson asked Sill about the candidates and their intelligence reports.  Sill informed Richardson that he felt Podschlne's reports were better.  Richardson also reviewed the intelligence reports.  He determined the consistency, depth, and writing of Podschlne's intelligence reports were of better quality than Deslauriers's reports.   Zetts reviewed some of the reports written by Deslauriers and Podschlne.  He determined Podschlne's reports were superior and contained more relevant, actionable information.  Deslauriers does qualify by arguing that insofar the United States claims that it reviewed Agent Deslauriers's intelligence reports for the period of time he served as Acting LBPA for purposes of comparing his qualifications to those of Agent Podschlne, Agent Deslauriers was charged with opening and establishing the intelligence unit and he had less time and opportunity to work on intelligence reports when compared to Agent Podschlne.  (Resp. SMF ¶¶ 36-38; Deslauriers Decl. ¶¶ 11-13.)[17]

The United States maintains that in Report # CMB-05-028, Deslauriers reported that a local business known for hiring illegal aliens was expanding and looking to hire more workers.  At the time of this report, it was common knowledge within Houlton Sector that this particular business employed illegal aliens.  (SMF ¶ 40; Sill Dec. ¶ 7.a.; Sill Dec. Ex. B (sealed exhibit).)  Deslauriers responds by denying that the Houlton Sector knew that the local employer was known to recruit illegal aliens.  (Resp. SMF ¶ 40; Deslauriers Dec. ¶ 25.)

---

[17]     There is a difference between a "police report" and an intelligence report. Police reports simply report incidents or occurrences. Intelligence reports contain significantly more detail. They may include background on the incident, history of the players involved, and a description of related incidents.  Intelligence reports may piece together pieces of information in order to detect trends. (SMF ¶ 39; Resp. SMF ¶ 39.) There is no real development in the parties' arguments of why this distinction is so crucial.

The United States maintains that in Report # CMB-05-027, Deslauriers reported that a subject from a town in Maine had been reported to be smuggling drugs into the United States from Canada.  The report did not contain details as to who the subject was, where he lived, with whom he associated, or the hours during which he was operating.  (SMF ¶ 41; Sill Dec. ¶ 7.b.; Sill Dec. Ex. C (sealed exhibit).)  Deslauriers responds that the lack of specific detail was intentional at the request of the source agency.  (Resp. SMF ¶ 41; Deslauriers Decl. ¶ 26.)  Additionally, he maintains that he had become cautious about including details in some of his written intelligence reports because, in a prior instance, despite directions that reports not be distributed, the agency had done so and compromised a source and that Deslauriers had specifically discussed this with Sill and he never disagreed with Deslauriers's approach and level of caution.  (Resp. SMF ¶ 41; Deslauriers Decl. ¶ 27.)

The United States maintains that in Report # CMB-05-032, Deslauriers reported the arrest of two individuals.  The report failed to address how the incident related to border security, the primary mission of CBP.  (SMF ¶ 42; Sill Dec. ¶ 7.c.; Sill Dec. Ex. D (sealed exhibit).)  The intended audience of this report, Border Patrol Agents and the station Marine Unit Agents, had no difficulty understanding how the information related to border security and, therefore, did not need additional detail.  (Resp. SMF ¶ 42; Deslauriers Decl. ¶ 28.)

The United States maintains that in Report # CMB-05-033, Deslauriers reported certain workers had been observed at a cannery, which received goods from another company known to hire illegal workers.  The report concluded the workers at the cannery were likely illegal workers, without providing additional facts to support this conclusion.  (SMF ¶ 43; Sill Dec. ¶ 7.d.; Sill Dec.Ex. E (sealed exhibit).) Deslauriers counters that his report was sufficient to apprehend the undocumented aliens.  (Resp. SMF ¶ 43; Deslauriers Decl. ¶ 29.)  Additionally he

reiterates that he had become cautious about including details in some of his written intelligence reports because, in a prior instance, despite directions that reports not be distributed, the agency had done so and compromised a source.  Deslauriers had specifically discussed this with Sill and he never disagreed with Deslauriers's approach and level of caution.  (Resp. SMF ¶ 43; Deslauriers Decl.  ¶ 27.)  Further, he maintains, this report resulted in development of the intelligence unit and making contacts and connections during the period of time, which was supposed to be Deslauriers's focus as Acting LBPA as he was charged with opening the unit. (Resp. SMF ¶ 43; Deslauriers Decl.  ¶ 11.)

The United States maintains that in Report # CMB-05-062, Podschlne reported the details of an interview of an alien.  Although the report did not result in actionable information at the time, it contained details on that alien's travel patterns, religious affiliation, money, and work plans that can be useful in the future when aliens of a similar background are interviewed.  (SMF ¶ 44; Sill Dec. ¶ 8.a.; Sill Dec. Ex. F (sealed exhibit).)  Deslauriers responds that this alien was apprehended by station agents and did not occur as a result of intelligence work.  Podschlne just happened to be the Acting LBPA when the apprehension occurred and this post-arrest interview would have been conducted by anyone serving in that capacity.  (Resp. SMF ¶ 44; Deslauriers Decl. ¶ 30.)

The United States maintains that in Report # CMB-05-076, Podschlne reported possible contraband smuggling on an international ferry boat.  The report included such details as prior incidents, information previously uncovered, and references to prior intelligence report numbers. (SMF ¶ 45;  Sill Dec. ¶ 8.b.; Sill Dec. Ex. G (sealed exhibit).)  Intelligence report 05-076 speaks for itself, insists Deslauriers.  (Resp. SMF ¶ 45.)

The United States maintains that in Report # CMB-05-055, Podschlne reported an attempted smuggling of aliens into the United States.  The report included details on the identity of the subjects, the statements made by the smuggler and smugglees, actions taken against these individuals, and information obtained by other law enforcement officers.  (SMF ¶ 46; Sill Dec. ¶ 8.c.; Sill Dec. Ex. H (sealed exhibit).)  Deslauriers denies that Podschlne should receive full credit for this investigation.  Deslauriers initiated this case while in the Acting LBPA position and worked long hours in conjunction with the Royal Canadian Mounted Police, the Immigration Control and Enforcement investigator in New York who had opened a case against this organization, the U.S. Customs Border Patrol officer at the Calais Port of Entry where the arrest ultimately took place, and others.  The arrest and prosecution was handled by the Calais Port of Entry, not Podschlne.  Also, when Podschlne became Acting LPBA, Deslauriers worked with him for a week to review all of his intelligence files and reports, including this ongoing investigation.  (Resp. SMF ¶ 46; Deslauriers Decl. ¶ 31.)

The United States maintains that in Report # CMB-05-077, Podschlne reported the details of an interview of an alien who had illegally entered the United States.  The report detailed the subject's interactions with alien smugglers and the subject's route of travel.  (SMF ¶ 47; Sill Dec. ¶ 8.d.; Sill Dec. Ex. I (sealed exhibit).)  Deslauriers responds that this alien was apprehended by station agents and did not occur as a result of intelligence work.  Agent Podschlne just happened to be the Acting LBPA when the apprehension occurred and this post-arrest interview would have been conducted by anyone serving in that capacity.  (Resp. SMF ¶ 47; Deslauriers Decl. at ¶ 32.)

With respect to all these statements, Deslauriers also denies that the Court can infer from this report that his investigation and writing skills were/are inferior to Podschlne's.  (Resp. SMF ¶¶ 40 -47.)

According to Deslauriers, Zetts nowhere appears to even have considered, let alone mention, Deslauriers' 13-page summary as Acting LBPA detailing his activities in establishing the new unit.  (SAMF ¶ 39A; Zetts Decl.  ¶ 13; Richardson Decl. ¶ 13, Sill Decl. ¶ 7.)[18]  With regards to the Deslauriers Report, the United States argues that it is not an intelligence report and Deslauriers's supervisor, Sill, does not recall the document for any official or unofficial purpose. (Resp. SAMF ¶ 39A; Suppl. Mar. 2009 Sill Decl. ¶¶ 4-5, 8.)  It also states that the memo's text does not support a claim of age discrimination; on the contrary, it is consistent with the conclusion of the deciding official, Zetts,  and the recommending official, Richardson,  that Deslauriers was a strong candidate, but in the final analysis he was not the best LBPA candidate in terms of analytical skills, as reflected by the statement on page one that the points are organized "in random order and the lengthy explanation on Page 12 of the many ways in which Deslauriers failed to accomplish his required tasks in the position, including his "best recommendation" that the position required "2 full time Lead Intelligence Agents at the Calais Station," which undermines the idea that Deslauriers was the best person to be selected to hold the job by himself.  (Resp. SAMF ¶ 39A; Ex. G at 1, 12, Doc. No, 53-8.)

Deslauriers also complains that Sill credits Podschlne for work done in the apprehension of criminals organized in an international smuggling ring, where much of the ground work involved was actually performed by Deslauriers.  (SAMF ¶ 39B; Deslauriers Decl. ¶ 31.)  Sill

---

[18]	The United States asserts that the thirteen page report (Docket No. 53-8, Ex. G) does not satisfy evidentiary standards because Deslauriers fails to establish a foundation or otherwise explain its purpose, date, method of creation, distribution list, or whether it would qualify as a reliable business record or investigative report. (Resp. SAMF ¶ 39A.)

embellishes the work done by Podschlne in conducting and writing up two post-arrest interviews, which would have been done by any LBPA who happened to be there and where Agent Podschlne's efforts did not lead to the arrest.  (SAMF ¶ 39C; Deslauriers Decl. ¶¶ 30-32.)  Sill also criticizes Deslauriers for failing to include sufficient detail in his reports when Sill was well aware that, as a result of an unauthorized dissemination of an intelligence report prepared by Deslauriers that compromised one of his sources, he intentionally minimized certain details from some of his written intelligence reports.  Sill never disagreed with this approach.  (SAMF ¶ 39D; Deslauriers Decl.  ¶ 27.)

The United States responds that Sill described the work Podschlne did on the case, particularly since Sill focused on the written product, not the underlying investigation.  (Resp. SAMF ¶ 35B; Sill Decl. ¶ 8.)  Deslauriers provides no foundation for the assertion concerning Sill's embellishment.  (Resp. SAMF ¶ 35C.)  It maintains that the focus of Sill's declaration was to compare the reports and point out examples of Podschlne's reports being superior to Deslauriers's.  (Resp. SAMF ¶ 35D; Sill Decl. ¶ 6.)  Moreover, up until now, when confronted with the issue of whether his intelligence reports failed to include key details, Deslauriers never asserted that there was any agreement to avoid the inclusion of details, but rather Deslauriers took the position that the assertion was untrue, stating for instance:  "Well, Matt Zetts says my intelligence reports had little actionable intelligence, a little more than a paragraph, with commonly known information, which is untrue.  That's why I have copies of almost all of my intelligence reports."  (Resp. SAMF ¶ 39D; Deslauriers Dep. at 116.)  Deslauriers has never before defended the absence of specificity in his reports with any assertion about the desire to

protect confidentiality, and his inconsistent assertion now does not generate a disputed issue of material fact.  (Resp. SAMF ¶ 39D.)[19]

**9.    Selection of Podschlne**

In about September 2005, the United States announced its selection of Agent Podschlne for the promotion to LBPA.  (SAMF ¶ 44; Resp. SAMF ¶ 44.)  According to the United States, after review of the intelligence reports, acting Zetts selected Podschlne for the position.  Zetts determined Podschlne was the best qualified candidate for the position based on Podschlne's application (summarized in the KT evaluation sheet), interview, intelligence reports, and the recommendation of Podschlne given by Richardson.  (SMF ¶ 48; Zetts Dec. a¶ 13; Zetts Dec. Ex. A at 3, 4, 5, 6, 7, 8, 9, 10.)  Although without record citation, Deslauriers denies the inference that Zetts made his selection of Podschlne for the LBPA position without considering the applicant's age.  (Resp. SMF ¶ 48.)

Patrol Agent In Charge Dick Gayton, who was the station supervisor for both Agent Deslauriers and Agent Podschlne at the time of the promotion decision, was not consulted about whom he believed would be the best person for the job.  PAIC Gayton says, "It is usually customary to solicit a recommendation from the 1st or 2nd line 'Supervisory Rating Official' when making selections for positions."  (SAMF ¶ 18; Resp. SAMF ¶ 18.)[20]  When DHS failed to

---

[19]    The United States opines that according to Deslauriers, relying on his own deposition, because he had worked in the Houlton Sector for 17 years, Deslauriers had greater knowledge of the Calais region and had developed a network of local contacts of law enforcement officers. (Id.) (citing SAMF ¶ 13;  Deslauriers Dep. at 113:14-20.) Agent Podschlne only had two years of experience in the Calais region and had minimal prior experience in intelligence. (Id.)(citing SAMF ¶ 14; Deslauriers Dep. at 113:19-20; Deslauriers Decl. ¶ 7, Ex. F.) The United States responds that Deslauriers cannot disavow Podschlne's experience in the Calais area, notes that Podschlne's application indicated that he had three years of experience in the Calais area, and observes that Deslauriers testified that he had no idea whether he or Podschlne developed more actionable intelligence.  (Id.) (citing Resp. SAMF ¶¶ 13-14, Deslauriers Dep. at 49-50.)

[20]    Deslauriers also states that Patrol Agent In Charge Larry Arthurs ("PAIC Arthurs"), who was a first line supervisor at the Calais Station and supervised both Agent Deslauriers and Agent Podschlne, was never contacted regarding the LPBA promotion. (SAMF ¶ 19; Deslauriers Dep. at 124:13-19.)  As the United States points out,

consult PAIC Gayton, PAIC Gayton called ACPA Richardson a few days before the selection

and recommended Agent Deslauriers over Agent Podschlne for the LBPA position:

> I told [Acting Deputy Chief Roland Richardson] that I would like to recommend SBPA Jeffrey Deslauriers for the Intelligence Agent Position. I told Richardson that Deslauriers had been the first agent detailed into the position. He had done what I felt was an outstanding job while he was detailed into that position, taking the lead and creating the program in the Calais Station into what it had become. I told Richardson I felt that Deslauriers' time in the station had enabled him to establish numerous contacts in the Intelligence community. Other agencies were constantly calling, looking for Deslauriers to share Intelligence or assist them in obtaining Intelligence. SPA Marc Podschlne was detailed into the position after Deslauriers. I told Richardson that I felt Podschlne was a good agent, but Podschlne's knowledge of the station, the area of his contacts were limited. I told Richardson that from my perspective in supervising the station and overseeing both agents, that I would recommend SPA Deslauriers to get the permanent Intelligence position.

(SAMF ¶ 20; Young Decl. Ex. A; Gayton EEO Decl. at 3-4.)  The United States qualifies this

additional statement by indicating that in the lines immediately following the quoted passage,

Gayton specifically contradicts Deslauriers's assertion that Gayton can provide information that

the selection was discriminatory. (Resp. SAMF ¶ ; Gayton EEO Decl. at 4.)[21]

There is no summary judgment dispute as to the following.  (SMF ¶ 49-52; Resp. SMF ¶

49-52.)  On September 28, 2005, acting Zetts signed the Non-Competitive Candidate Referral

List, indicating he had selected Podschlne for the position.  This list was returned to Human

Resources for processing.  It was later determined Podschlne's placement on the non-competitive

---

Deslauriers has not submitted a declaration by Arthurs to support this assertion and is relying on inadmissible hearsay in citing his own deposition. (Resp. SAMF ¶ 19.)

[21]     Relying on the same excerpt from the Gayton EEO Declaration, Deslauriers asserts PAIC Sill had a lesser ability than PAIC Gayton to compare Agents Deslauriers and Podschlne because, although PAIC Sill was detailed into the position of Acting Patrol Agent In Charge of the Intelligence Program, he was located at the Houlton Sector Headquarters in Hodgdon, Maine, approximately 85 miles north of the Calais Border Patrol Station. By way of comparison, PAIC Gayton worked in Calais directly with Agents Deslauriers and Podschlne on a day-to-day basis. (SAMF ¶ 21.)  The United States points out that there is not a proper foundation to support his comparison of the relative qualifications of the two supervisors to decide the selection issue.  (Resp. SAMF ¶ 21.)

list was in error because Podschlne had never permanently held a GS-12 position.[22]  In

processing the selection, Human Resources ultimately processed Podschlne as a competitive

selection.  Podschlne was eligible for placement on the Merit Promotion Certificate of Eligibles.

During the initial evaluation process by the HR Specialist, he received the highest score of all

applicants for the LBPA vacancy in Calais.  Thus, had he correctly been placed on the Merit

Promotion Certificate of Eligibles, he would have ranked first.  No Houlton Sector managers

involved in the selection decision, including acting Zetts and Richardson, were involved in the

creation of the selection lists.

      According to Deslauriers, Podschlne's improper placement on a non-competitive list

signaled that he had experience working in a permanent GS-12 position or higher, thereby

suggesting he had greater experience than he in fact had.  (SAMF ¶ 15; Zetts Decl.  ¶ 7; Seiner

Decl.  ¶ 5.)[23]  There is no dispute that, although the appropriate protocol to remedy such an error

would have been to cancel the non-competitive list and reissue it so Agent Podschlne appeared

on the competitive list with the other applicants, DHS failed to do so.  (SAMF ¶ 17; Resp. SAMF

¶ 17.)

      In September 2005 Zetts filled five other LBPA positions in the Houlton Sector and

awarded every position to candidates who were under the age of 40.  (SAMF ¶ 45; Leaman Decl.

¶ 6, Table 1; Resp. SAMF ¶ 45.)  The United States adds that Zetts represents that he was

unaware of the age of the selectees.  (Resp. SAMF ¶ 45; Zetts Decl. Ex A.at 6 (ques. 14).)

According to Deslauriers, although two out of the six LBPA positions that were filled at that

time had applicants over the age of 40, including Calais and Rangeley, no applicant over the age

---

[22]      (SAMF ¶ 16;Resp. SAMF ¶ 16.)
[23]      The United States responds that Deslauriers cannot rely on citations to his own declaration in support of
this additional statement (Resp. SAMF ¶ 15), which he clearly has not.

of 40 was selected.  (SAMF ¶ 46; Leaman Decl. ¶ 6, Table 1.)  The United States qualifies by

stating that in four of the six stations, no eligible candidate was over the age of 40.  In Rangeley

Station, one of the eligible candidates was over 40. He was not selected.  In Calais Station, three

of the eligible candidates were over 40.  They were not selected.  (Resp. SAMF ¶ 46; Leaman

Decl. ¶ 6, Table 1.)  Of the twelve "SBPA" -- Supervisory Border Patrol Agent -- positions Zetts

filled between 2002 and 2006, more than half of the selectees are under the age of 40.  (SAMF ¶

47;  Leaman Decl. ¶ 5, Table 2.)  The United States responds by observing  that with regards to

these twelve positions, four of the selectees were over 40, three were 39.  One was 38.  The

remaining four were under 38.  No information regarding the age of the other eligible applicants

for these positions has been supplied.  (Resp. SAMF ¶ 47; Leaman Decl. ¶ 11, Table 2.)

Deslauriers maintains that in his view Supervisory Border Patrol Agents are the closest in job

classification to LBPAs than any of the other positions filled by Zetts, as they are both GS-12

positions.  (SAMF ¶ 48;  Deslauriers Decl.¶14.)  To this the United States asserts that

Deslauriers's Declaration provides no foundation to compare job descriptions.  Moreover, it is

immaterial whether, in Deslauriers's opinion, one particular job is "closest in job classification"

to another job; instead, the issue would be whether management viewed the positions as

sufficiently similar for the purpose of making a comparison that might allow the finder of fact to

draw an inference of disparate age discrimination.  In addition, regardless of Deslauriers's

opinion, the positions are fundamentally different because the position of Supervisory Border

Patrol Officer involves supervision, which is a major responsibility that is not associated with the

position of Lead Border Patrol Agent.  (SAMF ¶ 48; Whearley Decl. Ex. C.)

10.    **Call to Plaintiff Regarding Nonselection**

On or about September 30, 2005, acting Richardson telephoned Deslauriers and advised him that Podschlne had been selected for the LBPA position for Calais Station.  (SMF ¶ 53; Resp. SMF ¶ 53.)  Richardson's intention during this telephone call was to encourage Deslauriers to continue applying for promotions in the future.  To that end, Richardson told him that the selection decision was a tough choice to make, that Podschlne's writing abilities had been determined to be stronger, and that he (Richardson) had not been selected the first time he applied for an ACPA position.  Richardson sensed Deslauriers was unhappy with the selection decision and that further discussion would be unproductive.  Accordingly, Richardson did not engage in further communication with Deslauriers regarding the nonselection.  (SMF ¶ ¶ 54, 55; Richardson Decl. ¶ 16.)  Deslauriers qualifies these representations by maintaining that the representation about Richardson's intentions during this call is a subjective and self-serving characterization.  (Resp. SMF ¶¶ 54, 55.)

Deslauriers insists that in response to Deslauriers's questions why he was not selected for the promotion to LBPA, he was given inconsistent responses.  Bennett told him he was rated on his resume, the KT score and the interview.  Zetts said it was the comparison of the investigative reports.  Richardson said writing skills were the determinative factor.  (SAMF ¶ 34; Deslauriers Dep. at 122:11-21.)

The United States responds that Deslauriers has oversimplified and distorted these statements.  It maintains that the responses are not inconsistent; rather the responses indicate what the particular individual considered, given his role in the selection process.  Bennett, who only participated on the interview panel, said he relied on the resume, KT score, and interview. (Resp. SAMF ¶ 34; Deslauriers Dep. at 122:14; Zetts Decl. ¶¶ 11-12; Zetts Decl., Ex. A at  3

33

(ques. 6).)  Zetts, the selecting official, testified that Deslauriers and Podschlne were both strong

candidates, therefore a review of the intelligence reports was done to assist in making the

selection decision.  (Resp. SAMF ¶ 34;  Zetts Decl. ¶ 13.)  However, throughout his EEO

declaration, and noted in his Declaration, he explains that overall he considered Podschlne to be

the best qualified candidate.  (Resp. SAMF ¶ 34; Zetts Decl. ¶ 13, Zetts Decl., Ex. A at pp. 4

(ques. 9), 5 (ques. 12), 6 (ques. 15), 8 (ques. 18), 9 (ques. 20).)  In a phone call to inform

Deslauriers of his nonselection, Richardson, the recommending official, said that Podschlne's

writing skills were a little better.  (Resp. SAMF ¶ 34;  Richardson Decl. ¶ 16.)  Richardson

confirmed in his Declaration that his review of the intelligence reports led him to conclude that

Podschlne's intelligence reports were of better quality than those of Deslauriers's, which, in part,

formed the basis for his recommendation of Podschlne.  (Resp. SAMF ¶ 34; Richardson Decl. ¶¶

14-15.)  Further, this statement to Deslauriers was in response to being pushed by Deslauriers

regarding the reason for his nonselection (Resp. SAMF ¶ 34; Deslauriers Decl., Ex. A. at 5-6

(ques. 9).)

   Deslauriers further maintains that writing skills was not among criteria advertised in the

job vacancy announcement as an important facet to the LBPA position and no writing sample

was requested.  (SAMF ¶ 35; Deslauriers Dep. at 122:19-21; Seiner Decl. ¶ 4, Ex. B.)  To this

the United States responds that the LBPA Position Description confirms that the incumbent must

provide advice "in oral and written format," and prepare "reports in sufficient detail to provide

case lead information and to support prosecutions."  (Resp. SAMF ¶ 35; Whearley Decl., Ex. C

at 3 ¶¶ 3, 6).  Also required is the knowledge and skill in interpreting information "to be used in

preparing briefing materials," as well as "knowledge of report writing and briefing techniques to

present finding to higher level officials," including skill in "communicating effectively both

orally and in writing," plus the "the collection and evaluation of intelligence information" to forecast anticipated illegal activity.  (Resp. SAMF ¶ 35; Whearley Decl., Ex. C at 4 ¶ 9, 5 ¶¶ 8, 10, 7 ¶¶ 1, 3).  Likewise, the Vacancy Announcement describes the qualifications for the position as including "reviewing, processing, and evaluating incoming intelligence information from a variety of sources, using creative methodologies to develop trends, patterns, profiles, estimates, studies, and tactical interdiction to solve unusual problems; collecting sensitive information regarding the criminal activities of aliens involved in alien smuggling, narcotics, trafficking, terrorism, and organized crime; [and] developing intelligence collection plans, including the most complex and difficult assignments."  (Resp. SAMF ¶ 35; Seiner Decl., Ex. B at 2.) Deslauriers also testified at his deposition that the most important part of the LBPA position involves collecting information and putting it into a report that is useful to the field agents (Resp. SAMF ¶ 35; Deslauriers Dep. at 38), and that one of the most important factors to the selection should be how a candidate's reports were presented and whether they were organized and clear. (Resp. SAMF ¶ 35; Deslauriers Dep. at 43.)  Although a writing sample was not requested, the selecting official had access to the intelligence reports drafted by the candidates.  (Resp. SAMF ¶ 35; Zetts Decl. ¶ 13; see also Richardson Decl. ¶¶ 12-13.)

There is no dispute that Deslauriers was never told his investigative reports or his writing were in any way deficient or needed any improvement.  (SAMF ¶ 36; Resp. SAMF ¶ 36.)

**11.   Deslauriers's EEO Complaint**

There is no dispute as to the following.  (SMF ¶¶ 64-66; Resp. SMF ¶¶ 64-66.)  In December of 2005, Deslauriers filed a formal EEO complaint alleging discrimination based on

age for his nonselection for the LBPA position.[24]  On or around March 2006, he filed a formal

EEO complaint alleging retaliation based on his nonselection for the detail to the

Commissioner's Situation Room.  The EEO complaints were consolidated and an investigation

commenced.

The United States represents that as part of the investigation, the EEO investigator

requested the KT evaluation sheets for Calais Station.  At the time, those sheets could not be

located and Zetts assumed they had been shredded.  However, the KT evaluation sheets for

Calais Station were later located.  (SMF ¶ 67; Zetts Dec. Ex. A at 14; Zetts Dec.  ¶ 14;

Richardson Dec. ¶ 8; Richardson Dec. Ex. A.)  Deslauriers counters that the statement that those

sheets "could not be located" and that Zetts "assumed they had been shredded" and were "later

located" recants prior testimony.  (Resp. SMF ¶ 67.)  In his Declaration submitted during the

EEO process, Zetts stated: "all information regarding the evaluation process of this [the LBPA]

position was shredded and is no longer available."  (Id.; Zetts Decl. ¶ 1, Exhibit A at 14; SAMF ¶

22.)  Also, Zetts's prior statement says that, in addition to KT sheets, other documents existed

regarding the LBPA promotion at issue in this case.  (Resp. SMF ¶ 67; Zetts Decl. ¶ 1, Exhibit A

at  12.)  None of the other documents have apparently been "located" as only the KT sheets are

referenced in the Zetts's Declaration in support of this motion.  (Resp. SMF ¶ 67; Zetts Decl. ¶

14.)

In his Declaration in support of this motion, Zetts now claims that when he made the

statement that he was referring only to the "K-T sheets," which his staff had told him had been

---

[24]      In his additional statement of fact Deslauriers states that on November 29, 2005, after going through
informal EEO counseling, Agent Deslauriers filed an age discrimination complaint with the EEOC. (SMAF ¶ 49;
Deslauriers Decl. ¶15.)  The United States responds that he submitted his formal complaint of discrimination with
the Agency on November 28, 2005, and the filing date of this complaint was December 5, 2005. (Resp. SAMF ¶
49.)

shredded, but that recently the KT sheets have been located and were not shredded after all. (SAMF ¶ 24; Resp. SAMF ¶ 24.)  In Zetts's earlier declaration submitted in the EEO process dated May 11, 2006, in response to the question whether he had "any documentation . . . relating to this selection process" he answered: "Yes, interview responses and notes."  (SAMF ¶ 25; Resp. SAMF ¶ 25.)[25]  Deslauriers insists that Zetts does not claim that those interview responses and notes have since been located.  (SAMF ¶ 26;  Zetts Decl. ¶ 14.)  The United States retorts that Deslauriers is completely mistaken to suggest that the interview notes and responses are somehow missing since they are included as Exhibits F-22 and F-23 of the underlying EEO Investigative Report (Whearley Declaration ¶ 5a, 5b; interview notes and responses attached to Whearley Declaration as Exhibits A & B), which Deslauriers and his counsel has had from the outset of this litigation as one of the most important sources of information (Deslauriers Dep. at 75).  Moreover, Zetts indicated he had interview responses and notes in his response to Question 23 of his EEO Declaration. Zetts Decl., Ex. A at 12 of 17.  His supplemental statement regarding

---

[25]        In responding to Deslauriers's additional statement ¶22, The United States offers the following qualification. In his May 2006 EEO affidavit (Docket 37-2, pages 1-13 of 17), Zetts was asked the following:
>    *Question 23. Do you have in your possession any documentation (written or nonwritten (e.g. video tapes) relating to this selection process which you used or which you created during the selection process? If yes, please describe the documentation.*
>    *Response. Yes, the interview responses and notes.*
>    *Question 24. Are you aware of documentation relating to this selection process (written or nonwritten) that is in the possession of others, which was used or created during this selection process? If yes, please describe the documentation and identify each person having possession of the documentation.*
>    *Response. Yes. The selection certificates, PARTS actions and paperwork generated between the Houlton Sector Administrative Officer and CBP HR Division concerning the selection are on file in the Houlton Sector Headquarters Facility.*

Docket #37-2, Zetts Decl., Ex. A at p 12 of 17. In July of 2006, Zetts supplemented his EEO affidavit (Docket # 37-2, pages 14-17 of 17), and explained that all information regarding the evaluation process of this position was shredded and was no longer available. Zetts specifically prefaced his supplemental statement by explaining that "[t]his statement is to address my response to **Question # 24**…." Docket # 37-2, Zetts EEO Decl. p. 14 of 17 (emphasis in original). The July 2006 Zetts supplemental EEO statement makes no reference to Question #23. *See id.* In January 2009 Zetts provided a Declaration in support of the pending motion for summary judgment in which he explained that the phrase "evaluation process" refers to the KT sheets. Docket #37, Zetts Decl. ¶ 14.  (Resp. SAMF ¶ 22.)

the documents that were no longer available was limited to his response to Question 24.  Id. at 14 of 17.  (Resp. SAMF ¶ 26.)

The Merit Promotion Plan requires "[a] temporary record of each action taken under the provisions of this Plan will be maintained for a period of at least 2 years from the date of selection or until the action has been formally evaluated by the OPM (whichever comes first) . . . .  The documentation should be sufficient to allow reconstruction of the entire promotion action, including documentation on how candidates were rated and ranked."  (Resp. SAMF ¶ 23, Seiner Decl., Ex. A, Sect. 8, accord SAMF ¶ 23.)

There is no summary judgment dispute as to the following.  (SMF ¶¶ 68-75; Resp. SMF ¶ 68-75.)  Richardson had retired from the Border Patrol prior to commencement of the EEO investigation.  The EEO investigator requested that he provide a statement, but Richardson declined to participate in the investigation.  His decision was based solely on the fact he had retired, was busy setting up his own business, and did not anticipate having future connections with the Border Patrol.  As part of the investigation, the EEO investigator created a listing of all candidates, with date of birth, for the LBPA position at each Station.  The results indicated each selectee for all six Stations was under the age of 40. The EEO investigator also included a list of 106 names, with dates of birth, representing selections made by Matthew Zetts.

## 12.  Detail to the Commissioner's Situation Room

On December 14, 2005, an email was circulated within Houlton Sector headquarters regarding an upcoming detail to the Commissioner's Situation Room in Washington, D.C., for which Houlton Sector was obligated to provide a BPA.  This email provided the names of nine BPAs within Houlton Sector who had volunteered for the detail, including three volunteers from Calais: Deslauriers, Mark Rogers, and Kerry Rogers.  (SMF ¶ 56; Resp. SMF ¶ 56.)

ACPA David Astle responded to the email,[26] stating that Deslauriers had been on several out-of-Sector details and that he (Astle) would suggest another BPA. At the time of this email, Astle oversaw Calais Station and personally knew Deslauriers had been on at least two extended details to the Border Patrol Academy.  (SMF ¶ 57; Astle Decl. Ex. A. at 6;  Astle Dec.  ¶ 7.) Deslauriers responds by insisting that the inference that Agent Deslauriers's other out-of-Sector details were the reason for his non-selection for this detail is denied.  Astle was aware of Deslauriers's report of age discrimination to the EEOC at the time, (Resp. SMF ¶ 57; Astle Decl. ¶4), and the United States deviated from normal practice regarding making selections for detail assignments.  (Resp. SMF ¶ 57; Deslauriers Decl. ¶¶19-24).

There is no dispute that Astle also responded that in assigning the detail, the manpower at each Station needed to be evaluated to ensure adequate coverage.  Around the same time of Astle's response, the managers at Houlton Sector headquarters discussed the manpower issue. They determined a BPA from Calais Station should be selected for the detail because it would suffer the least operational impact by losing a BPA for approximately 18 weeks.  (SMF ¶ 58; Resp. SMF ¶ 58.)  This detail to the Commissioner's Situation Room involved sending a BPA to Washington, D.C. for approximately 18 weeks, during which time the assigned BPA was responsible for receiving information from the field and reporting that information to his/her assigned Situation Room supervisor.  There were no specialized qualifications for the detail assignment. Any BPA, GS-11, was qualified to perform the detail.  (SMF ¶ 59; Resp. SMF ¶ 59.)

According to the United States, the detail to the Commissioner's Situation Room did not involve a temporary promotion, supervising other BPAs, or training other BPAs.  Further, this

---

[26]     There is no dispute that Astle was involved in the selection process for the Situation Room detail. (SAMF ¶ 52; Resp. SAMF ¶ 52.)

detail is not a prerequisite to obtaining any positions within a Border Patrol Sector.  (SMF ¶ 60; Zetts Dec. ¶ 18.)  Deslauriers denies the inference that detail assignments do not give advantage to employees seeking promotions and career advancement.  (Resp. SMF ¶ 60.)  According to him, detail assignments are viewed favorably -- are highly regarded, enhance the selectee's qualifications, and are well known for leading to advancement and promotions -- and can provide experience necessary to be competitive in applications for promotions, and can open doors for other opportunities for career advancement.  For example, Kerry Rogers, the person who was selected over Agent Deslauriers for the detail assignment to the Commissioner's Situation Room at issue in this case, obtained a promotion to a GS-13 position in Washington D.C. approximately one year following this assignment.  (Resp. SMF ¶ 60; SAMF ¶ 51; Deslauriers Decl.  ¶18.)  The United States is right that Deslauriers's declaration is not cognizable record support for establishing the <u>fact</u> of Kerry Rogers's change in pay-grade and that his opinion about the benefits of detail assignment for career prospects is of limited evidentiary weight standing alone.  (Resp. SAMF ¶ 51.)

In around March 2006, after he filed his claim with EEO and while it was still being investigated, Agent Deslauriers was turned down for a six-month detail position to work in the Commissioner's Situation Room in Washington, D.C.  (SAMF ¶ 50; Deslauriers Decl. ¶16.)  The United States qualifies this statement by asserting in or around March 2006, after Plaintiff filed his formal EEO complaint, Kerry Rogers was selected for an 18-week detail to the Commissioner's Situation Room.  (Resp. SAMF ¶ 50; Astle Decl. ¶ 6; Deslauriers Decl. ¶ 16; <u>see also</u> SMF ¶ 61; Resp. SMF ¶ 61.)  It also specifies that according to the Investigative File, the EEO Investigator received the case on March 15, 2006, and the investigation commenced April 3, 2006. (Resp. SAMF ¶ 50; Whearley Decl., Ex. D.)

In assigning BPAs for detail assignments, management at Houlton Sector headquarters takes a variety of factors into consideration. The primary consideration is impact on operations. Other considerations include qualifications, seniority, number of details the BPA has previously been assigned, training, expertise and skill set necessary for the detail, and personnel availability. There is no negotiated agreement in place with the union regarding detail assignments for Houlton Sector. (SMF ¶ 62; Resp. SMF ¶ 62; Resp. SAMF ¶ 54; Zetts Decl. ¶ 16; Astle Decl. ¶ 5.) According to Deslauriers, the primary criteria to determine who to select for detail assignments is the impact on operations of losing an agent. Other considerations include the number of details previously assigned, qualifications, and seniority. (SAMF ¶ 54; Astle Decl. ¶ 5.)

According to the United States at the time of the detail non-selection, Deslauriers had served more time on details than had Kerry Rogers. For example, he did in fact serve two extended details to the Border Patrol Academy: from September 26, 2002, to March 31, 2003, and from May 1, 2003, to December 20, 2003, while Kerry Rogers served two short term details for Calais Inventory Taking: from April 17, 2005, to April 23, 2005, and from May 1, 2005, to May 14, 2005. (SMF ¶ 63; Astle Dec. ¶ 10; Astle Dec. Ex. A at 4.) Deslauriers insists that the implication that Kerry Rogers's detail assignments were very short by comparison is misleading and is therefore denied. The detail assignment for Calais Inventory Taking was on-going beyond April 17, 2005, to April 23, 2005, and from May 1, 2005, to May 14, 2005. The assignment required her sole focus for short time periods, but the duties continued for a longer period of time, which Agent Rogers integrated into the performance of her other duties. (Resp. SMF ¶ 63; Deslauriers Decl.¶33.)

There is no dispute that Astle was aware at the time he made the recommendation for the selection for the detail assignment that Agent Deslauriers had sought EEO counseling regarding his nonselection for promotion to LBPA. (SAMF ¶ 53; Astle Resp. SAMF ¶ 53.)   Within weeks of learning that Agent Deslauriers had gone to the EEOC, Astle recommended that Deslauriers not be selected and Defendant selected Agent Kerry Rogers to fill the detail position.  (SAMF ¶ 55; Deslauriers Decl. ¶17; Astle Decl. ¶¶ 4, 7.)

At the time Kerry Rogers was selected for the detail assignment, Zetts was ultimately responsible for all selection decisions, including selections for detail assignments.  He has no recollection of the selection process for this detail and does not recall selecting Kerry Rogers, or any other BPA, to fill this detail.  (SAMF ¶ 56; Resp. SAMF ¶ 56.)  The United States maintains that after EEO counseling was completed, the final EEO Counselor's Report was submitted November 30, 2005.  (Resp. SAMF ¶ 55; Deslauriers Decl., Ex. H.)  On December 14, 2005, Astle sent an email stating "SPA Deslauriers has been on several out of sector details.  I would suggest someone else on this list."  (Resp. SAMF 55; Astle Decl., Ex. A.)  Some point later, Rogers was selected.  (Resp. SAMF ¶ 55; Deslauriers Decl. ¶ 17.)

At the time of the selection of Kerry Rogers for the detail assignment, Zetts was aware that Agent Deslauriers had filed an EEO complaint.  (SAMF ¶ 57; Resp. SAMF ¶ 57.)  Zetts stated in his EEO declaration that Richardson was responsible for making the selection for the detail assignment in the Situation Room.  (SAMF ¶ 58; Resp. SAMF ¶ 58.)  Richardson says he has no recollection of making the selection of Kerry Rogers to the detail assignment in the Situation Room.  (SAMF ¶ 59; Resp. SAMF ¶ 59.)  At the time of the selection of Kerry Rogers for the detail assignment Richardson was aware that Agent Deslauriers had filed an EEO complaint.  (SAMF ¶ 60; Resp. SAMF ¶ 60.)

42

Deslauriers believes that he was more senior than Kerry Rogers, who was the most junior agent in the Calais station at the time of the selection for this detail position.  (SAMF ¶ 61;Deslauriers Decl. ¶ 20.)[27]  It is his opinion that sending either Deslauriers or Rogers would have had equal impact on operations at the Calais Border Patrol Station.  (SAMF ¶ 62; Deslauriers Decl. ¶21.)  The United States points out that Deslauriers's declaration does not provide the foundation for his expertise on the impact of operations (Resp. SAMF ¶ 62) so this statement is material only to the extent that that is his opinion and to the extent that that opinion is material to the legal questions at hand.

Deslauriers asserts that at the time of the selection for this detail in 2006, Deslauriers had not been on a detail since 2003.  (SAMF ¶ 63; Deslauriers Decl.  ¶22.)  In contrast, Deslauriers asserts  Rogers had significantly fewer years of service and had been assigned to two details in 2005.  (SAMF ¶ 64; Deslauriers Decl.¶ 23.)  The United States qualifies this assertion by noting that at the time of the selection for this detail in 2006, Deslauriers had not been on an out-of-sector detail since he returned from an eight-month detail at the end of December 2003. (Resp. SAMF ¶ 63; Astle Decl. ¶ 10.)  Since that time, he had been on several in-sector details including: Detail to Calais Station Boat Unit - 5/30/04 to 2/5/05; Detail to Sector Intelligence Unit - 2/6/05 to 6/11/05; Detail to Calais Station Boat Unit - 6/11/05 to 10/15/05; Detail as Acting Supervisor - 10/30/05 to 1/7/06. (Resp. SAMF ¶ 63; Astle Decl. ¶ 10.)  It maintains that Deslauriers's comparison of the number of details is immaterial; the issue is how the employer perceived the matter.  (Resp. SMF ¶ 64.)

---

[27]     The United States argues that this declaration is not an adequate foundation for this statement. (Resp. SAMF ¶ 62.)  I do not agree given his long service.

13.     **Selections by Matthew Zetts**

With regard to the selections for the six LBPA positions, a review of the correct dates of birth for each candidate reveals that in four of the six Stations, there were no candidates who were over age 40 at the time of selection.  At Rangeley Station, one candidate out of five was over the age of 40 at the time of selection.  At Calais Station, three out of four candidates were over age 40.  The selectee, Marc Podschlne, was age 36 at the date of his selection.  With regard to the other selections made by Matthew Zetts, 72 of the selections involved transfers from the southern border.  For these transfers, there was no promotion involved.  Rather, GS-11 BPAs in southern border locations were reassigned to GS-11 BPA positions within Houlton Sector.  In the fall of 2003, there was an agency-wide initiative to increase the number of BPAs along the northern border.  Southern border BPAs submitted applications for reassignment, designating the northern border station(s) in which they were interested.  Zetts received the applications for those BPAs interested in Houlton Sector stations.  He asked members of his staff to pick out the BPAs in which they were most interested. Zetts then assigned Bennett to attend a meeting in which BPAs were selected for reassignment.  Selections were made in a round-robin fashion.

C.     **The Legal Claims**

1.     **Discrimination**

Respecting Deslauriers's first count, the claim of age discrimination, I summarized the legal standard earlier.  The parties do not dispute the framework and they do not dispute that the future of this litigation as to this count boils down to whether or not Deslauriers has created a

genuine dispute of material fact as to whether or not the United States' justification for its

employment decision was pretextual.  (See Mot. Summ. J. at 5; Resp. Mot. Summ. J. at 12.)[28]

With regards to his showing of pretext, Deslauriers points to the improper placement of

Podschlne on the non-competitive list, thereby signaling a greater experience than was accurate;

the failure to consult with a first or second line supervisor vis-à-vis the employment decision,

although it was customary to do so; the displacement of documents pertaining to the selection

process; and  Deslauriers's contention that he was interviewed with Richardson being out of the

three-person interview squad line-up and the assertion that he was asked different hypothetical

questions than was the selected candidate.  (Id.)

Deslauriers relies on Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006) for his assertion that

his superior qualifications when compared to Podschlne's is evidence of pretext:

> Here, whatever standard is applied with respect to qualifications, the evidence of
> Agent Deslauriers' superior qualifications for the LBPA position is
> overwhelming. Not only did Deslauriers have vastly more experience both within
> DHS (18 years versus 7 years), but he had 17 years experience as a SPA in the
> Houlton Sector versus Agent Podschlne's two (2) years of experience in the
> Region. As such, Deslauriers was far more familiar and had far more contacts in
> the Calais area than did Podschlne. Agent Deslauriers' superior qualifications
> were recognized by PAIC Gayton…. Hence, although the standard has been
> rejected, Deslauriers' superior qualifications virtually leap off the page. Even if
> additional evidence is required of pretext—and as set forth herein such evidence
> exists in the form of irregularities in the promotional process, the shifting reasons
> for the selection, and the statistical evidence—the disparity in qualifications
> between Agents Deslauriers and Podschlne compels the denial of DHS's
> summary judgment motion.

---

[28]      In its reply memorandum the United States does present an argument that there is no evidence that the
LBPA selection was made because of age. (Reply Mem. at 1.)  It asserts that the age differential was de minimus
and that Deslauriers was only 41-years-old at the time of the decision. (Id.)  It asserts that Zetts and Richardson did
not even know Deslauriers's age (id.), a fact in dispute.  In its motion for summary judgment the United States
expressly stated that it did not dispute Deslauriers's prima facie case, while noting that he crossed the 40-year-old
threshold by only one year.   (Mot. Summ. J. at 5.)  Given this express concession in its motion there was no reason
for Deslauriers to attempt to marshal his troops on the first element of the McDonnell Douglas inquiry. (See Resp.
Mot. Summ. J. at 11.)

(Resp. Mot. Summ. J. at 13, 15-16)(record citations omitted).  He also maintains that evidence of pretext is found in the "shifting and differing reasons" advanced by the interview committee for Podschlne's selection, citing Dominquez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000).  (Resp. Mot. Summ. J. at 16-18.)  Deslauriers summarizes:

> Here, there are substantial weaknesses and inconsistencies in DHS's explanation for its selection of Agent Podschlne which raise considerable doubt as to its explanation. Standard procedures were not followed, Agent Deslauriers' qualifications are far superior, inconsistent explanations have been provided, and ACPA Zetts repeatedly has awarded positions to younger employees. Under these circumstances, DHS's summary judgment motion must be denied with respect to the LBPA position.

(Resp. Mot. Summ. J. at 22.)

 In its reply memorandum addressing the issue of pretext, the United States reasons that "there is no evidence of pretext, let alone the type of pretext that would suggest age bias." (Reply Mem. at 3.)   The United States maintains that "when it comes to pretext, Deslauriers is the one whose positions have either been abandoned or debunked."  (Id.)  In short, the United States maintains that Deslauriers was not selected because when it came down to making a close call between the candidates, Zetts was of the opinion that Deslauriers's reviewed reports were inferior to Podschlne's.

Deslauriers is relying on circumstantial evidence.  And the First Circuit has cautioned that "at summary judgment [the Court does] not decide which explanation for the non-promotion is most convincing, but only whether [Deslauriers] has presented sufficient evidence regarding [his] … explanation."  Chadwick, 2009 WL 782822 at *7 n. 11 (citing Thomas, 183 F.3d at 61).

Deslauriers has produced evidence that the people involved in his selection (recognizing that Zetts insists he was the ultimate decider) explained his non-selection in different ways. Chadwick, 2009 WL 782822 at 7.  A jury could "reasonably question" Zetts's explanation

46

concerning Deslauriers's report-writing skills as being the deciding factor given that Deslauriers

had served for so long in a geographic area and in a capacity that well suited the position-of-hire,

Deslauriers's stellar performance reviews, and the absence of any earlier indication that he

needed to work on his report-writing skills or content.  Id.  At the time of their applications for

this position, Deslauriers had approximately 11 more years of experience with DHS than

Podschlne and, yet, if you buy the United States' argument, the age difference was minimal.

Deslauriers's application may not have stated his date of birth but it did indicate that he had been

a Border Patrol Agent since August 10, 1987.  It is a fair inference in Deslauriers's favor to

assume that Zetts would have concluded from the number of years of experience of Deslauriers

relative to Podschlne was an indicator of an older age.  Deslauriers would be able to testify to the

fact that at the time of this selection he had graying hair while, in his opinion, Podschlne had a

younger looking face.  Sill told Deslauriers that his work was "outstanding" and that he was

"impressed" with his reports.[29]  And as a supervisor of both candidates, Gayton reached out to

Richardson to recommend Deslauriers over Podschlne.  While Deslauriers's statistical evidence

may be underwhelming, the figures for Zetts's decision as to the six LBPA positions and the 12

SBPA positions support rather than undercut Deslauriers's argument that over all Zetts preferred

candidates under the age of 40.

On the other hand, there is no dispute Sill informed Richardson that he felt Podschlne's

reports were better; Richardson reviewed the intelligence reports and determined the consistency,

depth, and writing of Podschlne's intelligence reports were of better quality than Deslauriers's

---

[29]     At least at this stage of the litigation the facts relating to what Deslauriers wore to the interview and
whether or not he was unique is receiving a particular hypothetical question seem to be of little moment.  Thus, the
fact that John Krause's statements (see SAMF ¶ 32) may be hearsay as the United States contends is immaterial to
my analysis.  Additionally, although if this does proceed to trial the inquiry may bear some fruit, Deslauriers's
efforts to date to get the court to infer that there was some sort of cover-up apropos the interview process
documentation do not play a part in my estimation of the merits of his claim.

reports; and Zetts reviewed some of the reports written by Deslauriers and Podschlne, determining that Podschlne's reports were superior and contained more relevant, actionable information.  Focusing on the facts comparing the reports in question, the record evidence in support of the United States' assertion on this score is not overwhelming.

In my view: "A jury could rightly question whether this estimation of the reports "would actually trump [Deslauriers's] apparently weighty qualifications, or whether, given the other circumstantial evidence discussed above, [Deslauriers] was really passed over because of" his age. Chadwick,  2009 WL 782822 at 7.

## 2.    Retaliation

With regards to his retaliation claim, Deslauriers summarizes his factual basis for this claim as follows:

> [T]he award of the Situation Room detail to Agent Rogers rather than Agent Deslauriers came on the heels of Agent Deslauriers' complaint of age discrimination to EEO – just three (3) short months before. Indeed, David Astle's recommendation that Agent Deslauriers not be selected for this assignment came within weeks of his knowledge that Agent Deslauriers went through EEO counseling. In addition, the reasons offered for Agent Deslauriers' nonselection for this detail deviate from DHS practice. Agent Deslauriers had far greater seniority than Agent Rogers and Agent Rogers had been on two details in 2005, while Agent Deslauriers had not been on a detail since 2003. Since both employees performed the same function, either's absence from Calais would have had the same impact.

(Resp. Mem. Summ. J. at 20.)[30]

With regards to the impact of the non-selection on Deslauriers, the United States Supreme Court reflected in Burlington North  & Santa Fe Railroad Co. as to the materiality of an act of alleged retaliation:

---

[30]    The United States is not arguing that the filing of the EEO complaint was an act of disloyalty, see DeCaire, 530 F.3d at 19 ("As a matter of law, the filing of an EEO complaint cannot be an act of disloyalty to either the U.S. Marshals Service or the Marshal which would justify taking adverse actions."); rather, it asserts that the EEO complaint played no role in the contested detail decision.

We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale [v. Sundowner Offshore Servs., 523 U.S. 75,] 81-82 [(1998)]. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. Cf., e.g., Washington, supra, at 662 (finding flex-time schedule critical to employee with disabled child). A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. See 2 EEOC 1998 Manual § 8, p. 8-14. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." Washington, supra, at 661.

548 U.S. at 69.

In their reply memorandum, the United States asserts that the non-selection was not sufficiently adverse to make out a prima facie case of retaliation.  It opines:

Deslauriers also finds no support in Blackie v. Maine, 75 F.3d 716 (1st Cir. 1996), which he cites for the following proposition: "assignment which effectively denied promotions could be a materially adverse action" (Opp at 21). In Blackie, however, Judge Selya actually found as follows: "We agree that under certain circumstances an employer's inaction can operate to deprive an employee of a privilege of employment *that an employee had reason to anticipate he would receive*." Blackie, 75 F.3d at 726 (emphasis added). In Blackie, the issue was whether the State was required to negotiate a "side-agreement" for FLSA purposes, and the Court held that there was no adverse action in part because the plaintiff's "professed expectancy" was "only wishful thinking." Id. The same is true here: there was no adverse action because Deslauriers had no entitlement or expectation to the detail. Indeed, the "wishful" nature of participating in out-of-state details was confirmed at Deslauriers' deposition when he was asked to list those for which he was rejected, but it was impossible for Deslauriers to recall them all (Deslauriers Dep at 10).

In support of his allegation of lost promotional opportunities, Deslauriers also offers nothing more than his own conclusory statements (Deslauriers' Facts ¶ 51). But in this case, such speculation carries no weight because, as Deslauriers conceded, "there's always promotion potential within the Border Patrol" (Deslauriers Dep at 33). Moreover, as a matter of law, when a plaintiff claims that he suffered an adverse employment action because he was not considered for a

49

promotion, the allegation "cannot survive based solely on this speculation because "[s]ummary judgment is the 'put up or shut up' moment in the lawsuit. <u>Patterson v. County of Cook</u>, 2004 WL 1497786 at 12 (N.D. Ill. 2004) (citing <u>Johnson v. Cambridge Industries, Inc.</u>, 325 F.3d 892, 901 (7th Cir. 2003); <u>cf.</u> <u>Cuenca v. University of Kansas</u>, 265 F.Supp.2d 1191, 1208 (D. Kan. 2003) (where plaintiff alleged that a letter of reprimand affected future promotion potential, the court held that speculative harm did not constitute an adverse employment action, particularly where the plaintiff presented no evidence of an adverse action apart from his own conclusory allegations).

(Reply Mem. Summ. J. at 6- 7.)  It has not escaped me that in this passage, the United States is

citing to portions of Deslauriers's deposition that are not part of the summary judgment record.

It is not plainly evident from the summary judgment record just how "material" these <u>off</u>-sector assignments of such an extended duration are – especially an assignment to the nation's capital.  It is true that Deslauriers relies heavily on his own perspective when stressing the importance of these assignments to a career but it also must be acknowledged that Deslauriers had worked for nearly twenty years in the area of United States border security.  This is not a case where the action complained of - a full eighteen-week stint in Washington, D.C. - is esoteric, minor, or petty.  <u>See</u> <u>Burlington N. & Santa Fe Ry. Co.</u>, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.") (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996)). While the United States insists that Deslauriers cannot testify to Kerry Rogers's change in pay grade subsequent to her D.C. detail, I am unconvinced that as a co-worker well apprised of the dynamics of his co-workers he would not be able to state that it is his understanding that his co-worker received a two-step pay schedule increase, subject of course to cross-examination on his basis for knowing this and the United States' ability to disprove this assertion.  It is a legitimate inquiry given the <u>Burlington Northern</u> focus on how a certain employment decision would

50

objectively dissuade an employee in this specialized field from taking an action such as filing an age discrimination complaint.  See cf.  Burlington Northern and Santa Fe Ry. Co., 548 U.S. at 71 ("To be sure, reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."'") (quoting Oncale, 523 U.S., at 81).

With respect to his need to show a causal connection, Deslauriers stresses the temporal proximity between his EEO activities and the decision not to select him for the off-sector assignment to D.C. as proof of the necessary causal connection between his conduct and the act of retaliation.  Magistrate Judge Rich recently addressed the question of temporal proximity and the prima facie showing for a non-public employee's retaliation claim in Speckin v. Nestle Waters North America, Inc.:

> In some cases, temporal proximity alone is enough to "meet the relatively light burden of establishing a prima facie case of retaliation." DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir.2008) (suggesting that events within one year may be sufficient). Observing that three- and four-month periods have been held insufficient, the First Circuit upheld as sufficient temporal proximity a period of one month. Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir.2004). Other courts have held that longer periods are sufficient to establish temporal proximity. E.g., Espinal v. Goord, 554 F.3d 216, 2009 WL 224496 (2d Cir. Feb. 2, 2009), at *9 (six months); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir.2007) (three months). I am unwilling, given the light burden to be carried by a plaintiff at this point and the First Circuit's most recent pronouncement in DeCaire, to recommend that the court hold as a matter of law that a lapse of between two and three months, depending on the exact date that the plaintiff met with Gillis, between the plaintiff's last protected activity and the adverse employment action is insufficient, standing alone, to establish the requisite causal connection.

Civil No. 08-149-P-S, 2009 WL 905611, 11 (D.Me. Apr. 2, 2009); see also DeCaire, 530 F.3d at 19 (quoting Mariani-Colon, 511 F.3d and 224 and citing its "finding temporal proximity between

June 2002 allegations of discrimination and August 2002 termination sufficient to meet prima

facie burden"); Franco, 2009 WL 702221 at 11 -12 ("[I]n a retaliation claim a plaintiff must

show, by a preponderance of the evidence, that there exists a causal connection between the

adverse employment action and a protected activity.... These oral complaints took place less than

three months before the warning… [T]here was enough temporal proximity between the

complaints and the warning so that a causal nexus may be found."); Rhoades v. Camden Nat.

Corp., 575 F.Supp.2d 260, 262 (D. Me. 2008) ("Here, as presented by the Plaintiff, the temporal

proximity of her protected activity and the Bank's adverse employment action is particularly

compelling. Ms. Rhoades says that she applied for and received approval for additional FMLA

leave on May 30, 2007; that she complained on May 31, 2007 to the Bank's Human Resources

Department about its inappropriate use of her prior FMLA leave in her first trimester 2007

evaluation; and that she was terminated on June 11, 2007.  Under clear First Circuit precedent,

this close temporal proximity can be sufficient to sustain the Plaintiff's prima facie burden in her

retaliation claim.") (record citations omitted); compare  Moron-Barradas v. Department of Educ.

of Com. of P.R., 488 F.3d 472, 481 (1st Cir. 2007) (eight months between EEO complaint and

failure to certify plaintiff as a marketing teacher).

I conclude that Deslauriers has generated sufficient evidence that the initiation of his

EEO proceedings was the "but for" cause of this non-selection.  There is no dispute that Astle

knew the EEO process had been set in motion at the time of the selection decision.  This is the

kind of temporal proximity that falls with the First Circuit's lenient standard on establishing a

prima facie case for retaliation.

"Once the plaintiff has made a prima facie showing of retaliation," the First Circuit

explained in Calero-Cerezo, per McDonnell Douglas, the United States "must articulate a

legitimate, non-retaliatory reason for its employment decision.  If [it] meets this burden, the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus."  355 F.3d at 26 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).  As this claim has been joined in a summary judgment motion "the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus." Id. (citing Fennell, 83 F.3d at 535.)

Although on the record before the court the matter of the proffered non-retaliatory reason is a little questionable, Deslauriers has conceded the point and I will assume that the United States has proffered a legitimate non-retaliatory reason for its selection of Kerry Rogers over Deslauriers.  It asserts that the decision was made based on Deslauriers's prior selections relative to Kerry Rogers and a weighing of operational needs.

With respect to pretext and discriminatory animus, Deslauriers argues,

there is substantial evidence of unlawful retaliation with regard to the Situation Room detail. The temporal proximity of the decision to Agent Deslauriers' age discrimination charge, coupled with the fact that he was senior, had superior qualifications, and had been on a detail less recently all support his claim of his retaliation and compel denial of DHS's summary judgment motion on that count as well.

(Resp. Mot. Summ. J. at 22.)

There is no dispute that this selection was being made between three candidates after the operational impact narrowed the field to Calais personnel, a consideration which rather focuses the inquiry when it comes to estimating how discretionary the selection really was when one of the three who happened to be the more senior was an individual who was pursuing legal remedy

for his non-promotion.  There is no dispute that Astle was aware at the time he made the recommendation for the selection for the detail assignment that Agent Deslauriers had sought EEO counseling regarding his nonselection for promotion to LBPA.  The United States insists the primary consideration is impact on operations, but other considerations included qualifications, seniority, number of details the BPA has previously been assigned, training, expertise and skill set necessary for the detail, and personnel availability. The United States remains vague about how exactly all these specific factors could have impacted this decision and really only stresses the impact on operations and the relative number of details.  There is no dispute that any BPA, GS-11 was qualified to perform the detail and the operational impact was a factor that narrowed the choice down to the three Calais applicants and also answered the personnel availability factor.  Deslauriers represents that there would have been no difference in the impact on Calais operations had he been selected for the detail and the United States makes no argument countering this contention.  It has not suggested that anything but the history of assignments weighed against Deslauriers's selection over Kerry Rogers and there is some doubt that the conclusion on this score is legitimate.  And if seniority really is a factor there is no doubt it favored Deslauriers.[31]

Astle's choice between the three candidates was highly discretionary but: "Discretion may be exercised in ways which are discriminatory or retaliatory."  DeCaire, 530 F.3d at 20.  Once again the temporal proximity between the EEO complaint and the decision not to select Deslauriers is a significant consideration.  See DeCaire, 530 F.3d at 19; Mariani-Colon, 511 F.3d

---

[31]    It also only makes sense that someone with substantially more seniority would have had more details such as this on his or her record.  There is no effort to explain to the court how this might be reconciled with the weighing of the relative number of details between those seeking selection.

at 224; <u>Calero-Cerezo</u>, 355 F.3d at 25-26; <u>Venable v. T-Mobile USA, Inc.</u>, __ F.Supp. 2d __, __,

2009 WL 737685, 7 -8 (D.Me.Mar.20, 2009); <u>Rhoades</u>, 575 F.Supp.2d at 263.

I conclude that Deslauriers has mustered sufficient circumstantial evidence to survive

summary judgment on the question of pretext regarding his ADEA retaliation claim. <u>See</u> <u>Reeves</u>

<u>v. Sanderson Plumbing Prods, Inc.</u>, 530 U.S. 133, 148 (2000); <u>Chadwick</u>, 2009 WL 782822 at 7.

### *Conclusion*

For the reasons stated above, I recommend that the Court deny the motion for summary

judgment.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 16, 2009