UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY DESLAURIERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-07-184-B-W |
| | ) | |
| JANET NAPOLITANO, | ) | |
| SECRETARY, UNITED STATES | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION

Not every imperfect employment decision is a discriminatory one.   In an action tried before the Court under the Age Discrimination in Employment Act (ADEA), the Court concludes that Jeffrey Deslauriers failed to demonstrate that the United States Border Patrol discriminated against him on the basis of age or retaliated against him because of his discrimination complaint.   The Court grants judgment in favor of the United States of America.

## I.    STATEMENT OF FACTS

### A.    The Lead Border Patrol Agent Promotion

#### 1.    Jeffrey Deslauriers' Complaint

Mr. Deslauriers was born October 24, 1963.   *Tr.* 230:11-13.[1]  Mr. Deslauriers entered the Border Patrol on August 10, 1987, just shy of his 24th birthday.   *Id.*

---

[1] The transcript is filed under three docket numbers.  Docket Number 114 is the transcript of the first day of trial and encompasses pages 5 to 216.  Docket Number 115 is the transcript of the second day of trial and encompasses pages 217 to 396.  Docket Number 113 is the transcript of the third and

231:3-5.  He trained for four months at the Border Patrol basic academy in Glynco, Georgia.  *Id.* 231:23-232:3.  He began as a Border Patrol Agent in Laredo, Texas at a General Schedule Pay Scale of step five (GS-5) but shortly received his GS-7.  *Id.* 232:12-19.  He stayed in Laredo for 10 months; in the fall of 1988, he laterally transferred to the Calais, Maine station.  *Id.* 232:15-23.[2]  In 1989, he received his GS-9 and in April 2000, he became a Senior Patrol Agent (SPA) and received his GS-11.  *Id.* 233:5-6, 235:1-2.

In 2004, Mr. Deslauriers was assigned intelligence as a collateral duty, meaning he was responsible for gathering intelligence and submitting weekly intelligence reports, including the intelligence collected by other agents at the station, to Sector headquarters in Houlton.  *Id.* 236:17-23.  He received positive feedback for his work.  *Id.* 240:17-243:8.  In 2005, the Border Patrol created a new Lead Border Patrol Agent (LBPA) position dedicated to intelligence, and from January 31, 2005 to June 11, 2005, Mr. Deslauriers served as the acting LBPA.  *Id.* 237:7-10, 537:24-538:15.  Again, he received positive feedback.  *Id.* 33:12-24, 263:22-264:1, 275:21-276:16, 286:14-288:8, 560:25-561:4.  From July to August 2005, the Border Patrol advertised to permanently fill the LBPA position in Calais, a GS-12 position.  Ex. 24; *Decl. of Gary L. Seiner* ¶¶ 2, 4 (Docket # 42) (*Seiner Decl.*).  Charles Sill, Mr. Deslauriers' acting LBPA supervisor, encouraged him to apply and he did.  *Tr.* 264:14-19, 550:3-5.

---

final day of trial and encompasses pages 397 to 628.  For convenience, the Court generically cites *Tr.* and does not distinguish among the volumes.

[2] In Maine, six stations—Calais, Fort Fairfield, Houlton, Jackman, Rangeley, and Van Buren—reported to the Houlton Sector.  *Tr.* 82:19-20.

Mr. Deslauriers was one of two applicants from the Calais station to receive an interview. *Id.* 90:1-9. Mr. Deslauriers noticed that at his interview one of the interviewers was absent but no one explained to him why and the Border Patrol made no attempt to reschedule. *Id.* 292:15-293:1. At the end of the interview, Matthew Zetts, one of the interviewers, told Mr. Deslauriers that "he doesn't usually comment during the interviews, but that in [Mr. Deslauriers'] case, he thought [Mr. Deslauriers] did a really good job and that he was impressed with [Mr. Deslauriers'] answers." *Id.* 294:18-25, 478:18-479:1.

The Border Patrol informed Mr. Deslauriers that although he was a good candidate and the decision had been difficult, he was not selected. *Id.* 95:10-19, 295:1-296:7. Mr. Deslauriers asked for a reason and he was told that the other candidate had superior writing skills. *Id.* 295:22-296:2. Mr. Deslauriers did not believe it: he thought that writing was not as important a factor as experience and he always had received positive feedback for his writing. *Id.* 295:22-296:7; Ex. 14. Mr. Deslauriers knew that Marc Podschlne, the other Calais station applicant, was interviewed, and Mr. Deslauriers thought that he was better qualified for the job than Mr. Podschlne. *Id.* 296:3-6. Aware that Mr. Podschlne, the successful candidate, was younger and less experienced, and suspicious that their age difference was the real reason for the selection, *id.* 296:3-23, on December 5, 2005, Mr. Deslauriers filed a charge of age discrimination with the EEOC. Ex. 14.

### 2. Marc Podschlne: the Successful Candidate

Marc Podschlne was born in 1969. *Tr.* 203:13-14. In May, 1998 at the age of 29, he started working for the Border Patrol in Wilcox, Arizona. *Id.* 203:16-18. In 2003, he moved to New York for one year and then laterally transferred to the Calais station as a GS-11. *Id.* 203:20-24, 204:18-205:15. Mr. Podschlne was the acting LBPA after Mr. Deslauriers but only served in that capacity for six to eight weeks before the selection of the permanent LBPA. *Id.* 212:22-24, 115:10-16. Mr. Podschlne also applied for the permanent LBPA position and like Mr. Deslauriers, was selected for an interview. *Id.* 90:1-9, 115:2-6, 213:10-12. On October 16, 2005 he became the LBPA at the Calais station and he continues to work in that capacity today. *Id.* 213:6-9.

### 3. Richard Gayton and the Split-Chain of Command

Richard Gayton began with the Border Patrol in 1980 in Yuma, Arizona at the age of 25. *Tr.* 30:5-6. He transferred to Fort Fairfield, Maine in 1987 and became a Senior Patrol Agent. *Id.* 30:6-9. In 1993 he became the Patrol-Agent-In-Charge (PAIC) of the Calais station. *Id.* 30:7-11. He served in this capacity until his retirement in 2006 when he was replaced by Pat Murphy. *Id.* 30:1-2, 9-11, 196:2-4.

The PAIC is the highest-ranking agent in the actual Calais station. *Id.* 30:12-31:6. In 2005, a separate intelligence chain of command was created, meaning that the LBPAs and the acting LBPAs reported directly to the PAIC of intelligence in the Houlton Sector rather than the PAIC at the station level. *Id.* 451:13-21, 79:5-25, 54:6-10. Although not in the acting LBPA intelligence chain of

command, Mr. Gayton had frequent contact with the Acting LBPAs, received their intelligence reports, was responsible for their performance reviews, and generally observed their daily activities. *Id.* 32:15-33:8, 34:8-15. Mr. Gayton thought that Mr. Deslauriers did a better job in the acting LBPA position than Mr. Podschlne. *Id.* 33:9-36:8. Although no one asked Mr. Gayton for his opinion, he gave an unsolicited recommendation for Mr. Deslauriers to Roland Richardson, who acknowledged that he had heard Mr. Gayton. *Id.* 44:1-5, 45:6-46:3. Mr. Gayton was familiar with the written work in the two candidates' reports before giving his recommendation and he testified that they entered into the recommendation "[m]aybe to a small degree, maybe." *Id.* 38:3-11.

### 4.    The Decision-Makers

#### a.    Charles Sill, Jr.

Charles Sill was born in 1964, and in 1995, he began working for the Border Patrol at El Cajon, California at the age of 31. *Id.* 535:13-14, 531:9-13. He stayed in San Diego as a Border Patrol Agent for seven years and in 2002 was selected to be a GS-11 Senior Patrol Agent (SPA) in Fort Fairfield, Maine. *Id.* 531:14-20. In December 2003, he was promoted to be a Supervisory Border Patrol Agent. *Id.* 532:4-5. In February 2005, Mr. Sill was detailed to the Houlton sector as the acting PAIC of the intelligence unit and tasked with creating a sector-wide intelligence program with an intelligence officer in each of the stations. *Id.* 532:8-20. In this position, he oversaw the intelligence work of the LBPAs and reported to Mr.

Richardson, the Assistant Chief Patrol Agent of the intelligence program in the Houlton Sector. *Id.* 451:11-25.

### b. Roland Richardson

Mr. Richardson was born in 1950 and entered the Border Patrol in 1982 at the age of 32, the second oldest in his class. *Id.* 72:23-73:8. He began his duties at the Calexico station in southern California. *Id.* 73:9-18. Mr. Richardson applied but was not selected to be a GS-9 Patrol Agent at the Calais, Maine station. *Id.* 74:11-17. The Border Patrol supervisor who told him of his non-selection urged him to not get discouraged and suggested that he apply for an intelligence position at the Houlton, Maine sector. *Id.* He did, and in 1988, he was selected for the GS-12 position. *Id.* 74:4-6, 16-17. At the time of his transfer to Houlton, Mr. Richardson had "lived in Maine before" but had "no contacts" in the Houlton sector area. *Id.* 74:18-22.

In 1995, Mr. Richardson became the PAIC of the Houlton station. *Id.* 78:11-12. In 1998, Mr. Richardson was promoted to Assistant Chief Patrol Agent. *Id.* 78:17-23. In 2005 at the time of the LBPA selection, Mr. Richardson was the Assistant Chief Deputy Patrol Agent of the Houlton sector and assisted Mr. Zetts in making the selection of the permanent LBPAs. *Id.* 79:5-13, 455:20-23, 457:2-11.

### c. Matthew Zetts

Matthew Zetts was born in 1960 and entered the Border Patrol in 1984 at the Chula Vista, California station. *Id.* 447:7-14. In 1987, Mr. Zetts moved to West Palm Beach, Florida, as a Border Patrol Agent and later became a SPA. *Id.* 447:11-

23.  In 1994, he was promoted to PAIC of the Jacksonville, Florida station.  *Id.*

448:3-4.  He was again promoted to Assistant Chief Patrol Agent at the Border

Patrol Academy in Glynco, Georgia where he oversaw various departments.  *Id.*

448:6-18.

In 1999, he was transferred to Maine as an Assistant Chief Patrol Agent of

the Houlton sector.  *Id.* 448:20-22.  In 2002, Mr. Zetts was promoted to Deputy Chief

Patrol Agent.  *Id.* 449:2-3.  From 2003 to 2004 and again from 2005 to 2006, he

served as acting Chief Patrol Agent of the Houlton sector.  *Id.* 449:2-22.  The LBPA

position was filled during one of Mr. Zetts' stints as Acting Chief Patrol Agent,

making him responsible for the hiring decision.  *Id.* 454:18-455:2.

### 5.     The Acting LBPA Position

In 2005, the Border Patrol created the LBPA position and the station PAICs

were directed to fill the position with volunteers.  *Id.* 83:20-84:1.  The Border Patrol

used acting LBPAs to see who was interested in the LBPA position and to evaluate

how well they performed.  *Id.* 84:23-85:3, 538:5-12.  The acting LBPAs reported to

Mr. Sill: they spoke with him during a daily conference call, he reviewed the

intelligence information daily, and he reviewed the intelligence reports within a day

or two.  *Id.* 538:24-539:6, 542:3-10, 559:20-560:12.  Mr. Sill had little face-to-face

contact with the acting LBPAs, and Mr. Deslauriers testified that he only saw him

twice during his tenure as acting LBPA.  *Id.* 262:22-263:7, 555:7-21.

Mr. Deslauriers held the acting LBPA position for approximately 19 weeks,

from January 31, 2005 to June 11, 2005.  *Id.* 113:20-114:6.  As the first acting

LBPA, Mr. Deslauriers was responsible for establishing the program, which involved meeting with other intelligence agencies and explaining the program to the other agents in Calais. *Id.* 268:18-271:14. At first, Mr. Deslauriers had less time to do investigative work because he was focused on making these initial contacts. *Id.* 270:20-24, 271:23-272:3. Mr. Sill testified that Mr. Deslauriers "was very good at reaching out to other agencies" and "had a lot of contacts." *Id.* 539:12-21. Mr. Sill gave positive feedback to Mr. Deslauriers about his work, including his intelligence reports. *Id.* 275:21-276:16, 540:24-541:4, 549:21-24, 550:13-24, 552:2-8, 554:16-18; Ex. 93. Mr. Sill never told Mr. Deslauriers that there was anything wrong with his intelligence reports or that he needed to improve them. Mr. Sill described his job as keeping the agents "energized, engaged, motivated" and considered positive feedback as part of and "consistent with [his] management style." *Id.* 541:7-18.

Mr. Podschlne succeeded Mr. Deslauriers as acting LBPA in Calais and Mr. Deslauriers helped train him and introduced contacts to him. *Id.* 289:8-19, 570:3-20. Mr. Richardson noted that during his interview, Mr. Podschlne recognized that he had learned a lot from Mr. Sill and Mr. Deslauriers. Ex. 38. Several of the investigations initiated by Mr. Deslauriers came to fruition under Mr. Podschlne. *Tr.* 41:4-12, 568:10-569:4. Mr. Gayton testified that when Mr. Podschlne took over, "the phone calls [from other law enforcement agencies] kind of dropped off after a week or two" and there was less "sharing and gathering" of information from them. *Id.* 36:4-8. Mr. Sill testified that Mr. Podschlne did as good a job as acting LBPA as Mr. Deslauriers but had slightly better intelligence reports. *Id.* 539:22-540:8,

542:11-21, 543:25-544:9. Mr. Sill gave Mr. Podschlne the same type of positive feedback that he had given Mr. Deslauriers. *Id.* 541:22-542:2.

### 6.    The LBPA Position and Report Writing

On July 21, 2005, the Border Patrol posted the full-time LBPA job announcement, requesting applications until August 4, 2005. Ex. 24; *Seiner Decl.* ¶ 4. The job posting did not include report writing as one of the major duties of the job:

> you will provide guidance and technical direction to a team of intelligence agents; conduct or arrange training on team activities . . .; identify internal and external issues affecting the activities of the team and the intelligence operation within the Sector; review, prepare and present cases for administrative and criminal proceedings . . .; use a variety of techniques [for gathering intelligence]; collect sensitive information from other law enforcement agencies . . . ; and perform routine inspection duties. . . .

*Id.* at 2.

Nevertheless, Mr. Sill and Mr. Richardson testified that report writing was a significant part of the LBPA job. *Tr.* 77:16-78:7, 540:9-17. In 2007, the Border Patrol revised the LBPA position description and the importance of report writing is repeatedly mentioned. Ex. 25. Mr. Sill stated that he was on the team that revised the description and that the position had not substantially changed since 2005. *Tr.* 535:23-536:5, 537:6-12. Both Mr. Deslauriers and Mr. Podschlne knew that intelligence report writing was a required and important part of the job. *Id.* 206:2-12, 207:3-16, 353:18-354:17, 383:18-20. Both further stated that they wrote numerous intelligence reports as part of their acting LBPA duties. *Id.* 207:17-23,

354:2-11, 383:14-17.   Mr. Deslauriers mentioned his report writing experience several times in his application.  *Id.* 356:6-358:12; Ex. 28.

### 7.   Evaluation of the Applications

The candidates for the LBPA applied through an automated staffing system, which required them to complete an on-line questionnaire and upload a résumé and other supporting documents.  *Seiner Decl.* ¶ 4.  A Human Resource specialist at the Washington Service Center reviewed the applications to determine whether the applicants met the minimum eligibility requirement of one-year experience at the GS-11 level.  *Id.* ¶¶ 4-5.  There, two lists of eligible candidates were developed: a competitive list, which included the names of Mr. Deslauriers, Mr. Whittaker, and Mr. Miller, in that order; and a noncompetitive list, which included Mr. Podschlne.  *Id.* ¶ 6.  The noncompetitive list is for applicants who "hold or previously held a position at the same or higher grade . . . . ." *Id.* ¶ 5.

Mr. Podschlne's placement on the noncompetitive list was a mistake.  *Id.* ¶ 7.  Had Mr. Podschlne been ranked with the other agents on the competitive list, his name would have been listed first ahead of Mr. Deslauriers.  *Id.* ¶ 8.  The usual way to correct such an error would be to reissue a new competitive list.  *Id.* ¶ 9.  Mr. Richardson and Mr. Zetts agreed that Mr. Podschlne's placement on the noncompetitive list did not affect the selection process, and Mr. Richardson nonetheless recommended both Mr. Deslauriers and Mr. Podschlne for interviews.  *Tr.* 89:18-90:11, 456:7-22.

After receiving the lists of certified candidates, Mr. Zetts asked Mr. Richardson to evaluate the applications and recommend which candidates should be interviewed. *Id.* 85:8-10, 456:23-457:4. The Border Patrol usually picked the candidates to interview by performing a Kepner-Tregoe (KT) test, a method of ranking and rating the applicants based on information contained in the applications. *Id.* 85:14-18. Mr. Zetts testified that the KT is not always used. *Id.* 471:4-25. Mr. Zetts instructed Mr. Richardson to do a partial KT because the applicants were from Calais and familiar and because the list of candidates was relatively small. *Id.* 87:11-13, 88:4-20, 472:7-16. For the partial KT, Mr. Richardson recorded information from the application on the KT form but did not derive a numerical score or ranking as he would have for a full KT. *Id.* 87:14-88:3, 90:10-12, 473:2-23; Ex. 100A. Mr. Zetts was initially unable to produce the partial KT and assumed it had been shredded according to standard Border Patrol procedure but it was later discovered. *Tr.* 459:8-23.

Mr. Richardson testified that it was easy to determine that Mr. Deslauriers and Mr. Podschlne were the top candidates, and he recommended them to Mr. Zetts. *Id.* 88:8-89:2; 90:2-9. Mr. Zetts looked over the applications, the partial KT summaries, and accepted Mr. Richardson's recommendation. *Id.* 458:15-21.

During discovery, the Border Patrol produced a KT matrix with labeling that suggested it was for the position of "lead intelligence agent" for the Houlton Sector. Ex. 36. The categories differed between the partial KT form used and the KT matrix produced and both Mr. Richardson and Mr. Zetts testified that they had

never seen the KT matrix and did not know why it was made. *Tr.* 104:15-105:3, 476:3-5; *compare* Ex. 100A, *with* Ex. 36. The KT matrix gave weights to several factors: assigning the most weight to border patrol experience, analyzing problems, and computer skills; less weight to other intelligence experience, organizational skills, and writing/communication skills; and the least weight to the ability to maintain confidentially and knowledge of world affairs. Ex. 36.

### 8. The Interview

Having selected the top candidates, Mr. Zetts asked Mr. Richardson and Assistant Chief Patrol Agent Monte Bennett to participate on the interview panel. *Tr.* 90:18-22. Mr. Richardson described his role as assisting Mr. Zetts in making the selection by gathering information and giving Mr. Zetts "a chance to discuss the interview among [the interviewers] to see if [they] had read the candidate correctly." *Id.* 153:4-8. The interviewers made a list of seven basic questions to ask each candidate, but it was contemplated that "[the interviewers could] peel off from those depending on the responses or something that [they] might know about the candidate . . . ." *Id.* 142:15-23.

Mr. Richardson was on sick leave the day of Mr. Deslauriers' interview, and there was no attempt to reschedule. *Id.* 91:3-12, 139:6-25. Mr. Richardson testified that his absence was not unfair to Mr. Deslauriers because Mr. Zetts, the actual decision-maker, was absent from several other interviews and "[they] had discussions about the interviews on how people did within the interviews." *Id.* 140:5-18.

Mr. Deslauriers and Mr. Podschlne were asked the same seven standard questions. Exs. 37-38. In addition, Mr. Deslauriers was asked to name his biggest contribution to the Calais station, how he would handle reporting to a supervisor not based in the station, how he would prioritize assignments between the station and intelligence chain of command, and how he would handle a situation in which he was awarded the position over another candidate at the same station. *Tr.* 293:22-94:17. Mr. Podschlne was asked how he would handle a situation in which another agent from the same station was selected over him, how he would deal with working extra hours, and what he thought about his written product. *Id.* 145:14-146:8. After Mr. Deslauriers' interview, Mr. Zetts told Mr. Deslauriers that although he usually did not comment after interviews, Mr. Deslauriers had done "a really good job and that he was impressed with [his] answers." *Id.* 294:21-25, 478:25-479:1. Mr. Richardson heard from Mr. Bennett that Mr. Deslauriers had done a good job at the interview. *Id.* 150:9-13.

### 9. The Hiring Decision

Mr. Richardson thought that both Mr. Deslauriers and Mr. Podschlne had done well in the interview and were "very, very close." *Id.* 92:10-11. Because it was so close, Mr. Zetts asked Mr. Richardson to "effect the review of the intelligence reports" prepared by the two candidates. *Id.* 463:10-22, 510:4-16. He did not specify to Mr. Richardson whether Mr. Richardson or a subordinate should perform the review. *Id.* 510:14-16. At trial, Mr. Zetts stated that he wanted to have the reports reviewed from a substantial period of time. *Id.* 511:3-7. He could not

remember the exact span but after looking at his EEOC declaration, he confirmed that at one point he had remembered the span as two years. *Id.* 512:22-25; Ex. 92.

Mr. Richardson asked Mr. Sill for his evaluation because Mr. Sill had closely overseen the candidates as acting LBPAs. *Id.* 92:11-20. Mr. Sill told Mr. Richardson that "while [he] thought they were both good and either would do a fine job, [he] felt that Marc Podschlne's intelligence reports were better." *Id.* 93:1-10, 544:17-25. Mr. Richardson could not remember whether he had specified the span of time for which Mr. Sill was supposed to review the reports. *Id.* 133:23-134:5. Mr. Sill did not re-review any reports because he was already familiar with them. *Id.* 567:3-14. After receiving Mr. Sill's endorsement, Mr. Richardson also reviewed some reports but could not remember which ones. *Id.* 93:24-94:3. He agreed with Mr. Sill that Mr. Podschlne's reports were preferable because they would be easier to read by outside agencies. *Id.* 94:6-13, 137:10-17.

Mr. Richardson did not ask for Mr. Gayton's recommendation, even though his opinion had "usually" been asked for in the past. *Id.* 44:6-12. Mr. Gayton made an unsolicited recommendation to Mr. Richardson, stating that he "thought that [Mr. Deslauriers] had done a very good job. . . . And [he] just felt that [Mr. Deslauriers'] knowledge compared to Mr. Podschlne's was greater. Marc was a good officer, but Marc's knowledge of the area and his contacts . . . weren't even close to what Mr. Deslauriers had established." *Id.* 44:13-45:17. Mr. Richardson did not remember receiving a recommendation from Mr. Gayton but said that such a

recommendation if given "would have had very minimal impact because [Mr. Deslauriers] was not working for Agent Gayton." *Id*. 151:4-10.

Mr. Richardson and Mr. Bennett both recommended Mr. Podschlne to Mr. Zetts. *Id*. 94:24-95:6, 464:18-22. Mr. Zetts asked for the reports so he could review them himself, and he testified that he reviewed "a few." *Id*. 94:18-95:3, 464:7-8. Mr. Zetts also determined that "Mr. Podschlne wrote more detailed, relevant reports" than Mr. Deslauriers. *Id*. 464:11-12. Mr. Zetts selected Mr. Podschlne for the position. *Id*. 95:7-9.

### 10. The Courtesy Call

After the decision, Mr. Richardson called Mr. Deslauriers to tell him that he was not selected. *Id*. 95:10-12. Mr. Richardson encouraged Mr. Deslauriers to continue to apply to other job openings, and he told Mr. Deslauriers that Mr. Richardson "was not selected the first time that [he] put in for the assistant chief's job, and to . . . continue because [he] thought [Mr. Deslauriers] was a good candidate." *Id*. 95:14-19. Mr. Richardson told Mr. Deslauriers that it was "a really close call" and "a tough decision." *Id*. 148:24-149:3. Mr. Richardson told him he had done a good job at the interview, but that in the end Mr. Podschlne was selected based on his superior writing skills. *Id*. 149:18-150:8.

### 11. The Age Difference

The applications did not include the ages of the applicants. Exs. 28, 30. However, Mr. Deslauriers' application showed his graduation year from both high school and college and Mr. Podschlne's application gave the graduation year from

college.  Exs. 28, 30.  The applications also showed that Mr. Deslauriers had 17 years of service with the Border Patrol whereas Mr. Podschlne had 7.  Exs. 28, 30.  Both Mr. Zetts and Mr. Richardson testified that they did not know the age of either candidate when they made the selection.  *Tr.* 81:15-20, 450:11-12.

### 12.   **Other Hiring Decisions**

#### a.    **LBPA**

In 2005, Mr. Zetts also selected the LBPAs at the other stations in the Houlton Sector.  *Id.* 454:18-21.  In the Rangeley station, only one of the five candidates who applied for the LBPA position was over the age of forty.  Ex. 39.  The two agents who served as acting LBPAs were under the age of forty and one of them was selected for the permanent position.  *Id.*  In Fort Fairfield, Houlton, Jackman, and Van Buren, none of the candidates was over the age of forty.  *Id.*  The agent selected at all four stations had served as acting LBPA.  *Tr.* 547:17-548:9.

#### b.    **Other Positions**

Mr. Zetts also filled twenty-six positions in the Houlton Sector, excluding the six LBPA selections and non-promotion transfers.  *Tr.* 406:10-407:18; Ex. 102.  Data is only known about the selected agents.  *Tr.* 409:19-25; Ex. 102.  Of the total, Mr. Zetts selected thirteen candidates who were older than forty and thirteen candidates who were younger.  *Tr.* 411:6-16; Ex. 102.  Twelve of the twenty-six selections were for Supervisory Border Patrol Agent (SBPA), one seniority rank higher than Border Patrol Agent.  *Tr.* 432:10-20; Ex. 102.  For the twelve SBPA openings, Mr. Zetts selected eight agents under the age of forty.  *Tr.* 432:21-23; Ex.

102. Including the selection for internal research analysts and border patrol pilots, Mr. Zetts selected ten candidates under the age of forty and five candidates above. *Tr.* 432:24-433:22; Ex. 102.

## B. The Retaliation Claim: The Situation Room Detail

### 1. Details in General

A detail is a broad term used to describe periods of time in which a border patrol agent is taken away from normal duties and assigned other specific duties. *Tr.* 164:8-15, 245:3-15. Mr. Deslauriers described a duty as

> it could be the same type of [regular] duties in a different location. It could be within the sector. It could be out of the sector. [An agent] could be detailed for training. [An agent] could be detailed for an operational detail where they would focus a large number of agents in a certain part of the border.

*Id.* 245:6-11. Details can last a few days to several months. *Id.* 162:23-163:5. Detail selections are not governed by union rules. *Id.* 164:18-165:2. Instead, several factors are considered, including seniority, *id.* 165:3-5; job skills, *id.* 164:2-4; availability, *id.* 164:4; impact on operations, *id.* 164:4-6; and prior opportunities to serve on details, *id.* 469:10-14.

### 2. The Situation Room Detail According to Mr. Astle

David Astle, an Assistant Chief Patrol Agent in the Houlton sector since 2002, testified to the nature of the situation room detail. *Id.* 158:13-14, 160:10-14, 165:25-172:8. Mr. Astle equates the situation room detail to a "fund-raiser" because there are "a bank of phones, kind of a phone operator type of area." *Id.* 166:4-6, 166:25-167:2. He described how Border Patrol agents call the situation room to

report significant incidents. *Id.* 167:1-11. He stated that the agent receiving the call writes up the incident, summarizes it in a report, and then gives the report to a supervisor. *Id.* 171:2-7. The supervisor edits the report and sends it to the commissioner and other high-ranking Border Patrol officials. *Id.* 171:7-10. Because the situation room is basically "answering the phone," Mr. Astle does not consider the situation room to be a career-enhancing detail. Id. 170:23-171:2. Although admitting that the location of the situation room at headquarters increased the opportunity for chance meetings with high-ranking Border Patrol officials, Mr. Astle disagreed that the situation room provided any real opportunities for such contact. *Id.* 182:8-25.

Mr. Astle asserted that since 2005 there have been numerous opportunities for GS-11 border patrol agents to become a GS-12 in Washington, D.C. *Id.* 171:11-15. Because "headquarters also dramatically increased; they've quadrupled in size," Mr. Astle stated that "[a]nybody who would like to put in for Washington I'm sure would get it back during 2005 up through today." *Id.* 171:11-18. Mr. Astle described how Mark Rogers, another agent at the Calais station who was denied the situation room detail, was promoted to a GS-12 operations officer in Washington, D.C. without having first worked on the situation detail before transferring. *Id.* 171:20-172:5.

### 3. The Situation Room Detail According to Mr. Deslauriers

Mr. Deslauriers first heard about the situation room detail in late 2004 or early 2005 during a conversation with Mr. Gayton and Supervisory Border Patrol

Agent Larry Arthurs who had both been to the situation room. *Id.* 313:12-15, 314:15-19. Mr. Gayton and Mr. Arthurs described the detail to Mr. Deslauriers and some of its advantages. *Id.* 313:15-17. Mr. Deslauriers concluded that "[i]t sounded like a really interesting detail and a way to . . . further [his] career . . . ." *Id.* 313:17-18. At that time, however, the situation room detail was available only to supervisors. *Id.* 314:6-9.

Based on this and other conversations with people who had gone to the detail, Mr. Deslauriers disagreed with Mr. Astle's description of the situation room. *Id.* 314:23-315:2. He described how the situation room agents "provide input into the creation of the report [and] submit it to the commissioner so that he's up to speed on what's going on every day." *Id.* 315:2-24. Mr. Gayton and Mr. Arthurs told Mr. Deslauriers that it was an excellent opportunity to meet Border Patrol "brass" because "[i]t's basically the nerve center of the border patrol. So there is tremendous opportunities to . . . network while you're down there." *Id.* 316:23-317:4. Because border patrol was always detailing people in and out, "you always run into somebody you know, or that you've worked with in the past. So for those reasons, it was . . . a highly coveted detail." *Id.* 317:5-12.

## 4. The Applicants: Mr. Deslauriers and Kerry Rogers

By the time he volunteered for the situation room detail, Mr. Deslauriers had already completed a number of details. In 1994, he was detailed to a criminal apprehension program in Florida. *Id.* 245:17-24. In 1998, he was detailed to Brownville, Texas, to increase forces on the Mexican border. *Id.* 245:25-246:3. He

was detailed to a four-week boat handling school in Glynco, Georgia. *Id.* 246:4-5. In 1996, 2002, and 2003, he was detailed to South Carolina as a driving instructor. *Id.* 246:6-15. In 2000, he was assigned to the Maine Drug Enforcement Agency for a year. *Id.* 246:11-13.

In contrast, in 2005 when Kerry Rogers applied for the situation room detail she was the most junior agent at the Calais station. *Id.* 318:23-25. She was hired by the Border Patrol in November 15, 2003 and assigned to Laredo, Texas. *Id.* 435:24-436:6. In December 2003, she moved to the Calais, Maine station as a GS-11. *Id.* 436:6-7. While at the Calais station, Ms. Rogers was sent on an out-of-sector detail to San Diego, California to learn about recruitment techniques for the Border Patrol. *Id.* 439:4-12. When she returned to Maine she was never asked to do any official recruitments. *Id.* 444:6-11. She testified that she had been on "tons" of details previously. *Id.* 445:22-446:2.

In February 2006, Ms. Rogers applied for and was awarded the situation room detail. *Id.* 196:17-197:3. Ms. Rogers worked on the detail for 11 months and then returned to Maine for three months. *Id.* 440:2-4, 442:4-7. In July 2007, she became the National Program Manager for the horse patrol at Border Patrol headquarters in Washington D.C. *Id.* 442:10-23. It is a GS-12/13 position, meaning that the first year it was a GS-12 pay scale and then it became GS-13. *Id.* 438:20-23. She included the situation room detail on her resume. *Id.* 441:13-17. She said that she got her current position when someone she knew from Border Patrol in the

Laredo Sector, where she had served prior to being in Maine, made a phone call on her behalf. *Id.* 443:5-21.

### 5. The Selection

On November 3, 2005, Mark Ritchie, an Assistant Chief Patrol Agent at the Houlton Sector, informed the first-line supervisor by email about a situation room detail that would last from March 19, 2006 to July 22, 2006. Ex. 20. Mr. Ritchie asked that the supervisors solicit volunteers and submit the agents' names as they received them. *Id.* Kerry Rogers submitted her name to her first-line supervisor, Larry Arthurs, who forwarded it to Mr. Ritchie on November 10, 2005. Ex. 21. Mr. Gayton also forwarded Ms. Roger's name to Mr. Ritchie on December 13, 2005, specifying that she had originally volunteered when the Border Patrol had sent another agent. *Id.* Mr. Deslauriers immediately submitted his name when he learned about the detail. *Tr.* 317:13-21. Nine agents volunteered. Ex. 23.

On December 14, 2005, Mr. Ritchie emailed Mr. Zetts, Mr. Richardson, Mr. Bennett, and Mr. Astle the names of the volunteers and asked for their recommendations. Ex. 23. Later that day, Mr. Astle responded to the group, writing that Mr. Deslauriers "has been on several out-of-sector details. [Mr. Astle] would suggest . . . someone else on the list. However, we will need to look at the current detailers to ensure each station has enough personnel for 7/24 coverage." *Id.* When he sent the email, Mr. Astle had "program oversight of the Calais station . . . [and] was aware of [Mr. Deslauriers'] details" and that Mr. Deslauriers had been on a couple of academy and internal details. *Tr.* 169:4-8, 169:21-170:1. He also

knew both that Ms. Rogers had "put in for a couple of details . . . that had been canceled and/or just did not get selected for it," *id*. 169:15-18, and that Ms. Rogers had recently returned from a three-day out-of-sector training, which she attended after Mr. Delsauriers' last out-of-sector detail. *Id*. 178:21-24, 181:8-12.

Mr. Zetts decided who was sent on the situation room detail, but at trial he could not remember the selection process. *Id*. 467:12-22. At the time of the selection, Mr. Delsauriers thought that Mr. Zetts and others in the sector were aware of his discrimination complaint because of the EEO investigation. *Id*. 328:21-329:3. On February 6, 2006, Mr. Ritchie asked Patrick Murphy, who had taken over as PAIC of Calais for Mr. Gayton, to tell Ms. Rogers that if she was still interested in the situation room detail she could go. *Id*. 196:17-197:3. Mr. Delsauriers learned in March that Ms. Rogers had been selected when he overheard agents discussing it. *Id*. 320:6-11.

### 6. A Feeling of Unfairness

Mr. Delsauriers confirmed with PAIC Murphy that Ms. Rogers had in fact been selected. *Id*. 320:15-23. Mr. Delsauriers asked why Ms. Rogers was selected but cannot remember Mr. Murphy's response. *Id*. 320:15-321:7.

Mr. Delsauriers was surprised Ms. Rogers was selected because she was the most junior agent in the station and Mr. Delsauriers knew that seniority was one part of the selection process. *Id*. 319:23-25. Mr. Delsauriers also knew that Ms. Rogers had recently had recruitment training in California. *Id*. 319:1-3. Because she was one of only two recruiters in the sector and the sector was trying to hire

new agents, Mr. Deslauriers did not understand why Ms. Rogers was selected for the situation room detail. *Id.* 319:5-11. He "found it hard to believe that they'd selected somebody that they have already put the money to train and equip . . . to do a detail in Washington, D.C." *Id.* 319:9-11. Furthermore, Mr. Deslauriers did not think that his absence from Calais would affect the staffing at the station. *Id.* 319:16-20.

Mr. Deslauriers asked Mr. Arthurs, his first-line supervisor, but he also did not know the reason for the selection. *Id.* 321:15-322:8. Mr. Deslauriers then spoke with Mr. Murphy and Mr. Arthurs together. Mr. Deslauriers remembers both saying that Ms. Rogers would not go on future details because she needed to stay and learn her station area. *Id.* 322:15-19. On March 24, 2006, Mr. Deslauriers emailed Mr. Murphy, informing him that he had filed a formal retaliation complaint against the Sector. Ex. 41. On March 28, 2006, Mr. Deslauriers filed a retaliation complaint with the EEOC. Ex. 16.

### 7. The After the Fact Offer

The situation room detail was for six months but could be extended for another six months. *Tr.* 197:6-9. Before the first six months was finished, Mr. Murphy asked Mr. Deslauriers if he wanted to take the second half of the detail. *Id.* 197:9-11. Mr. Deslauriers turned down the offer. *Id.* 199:5. Mr. Deslauriers explained that by the time he was offered the detail, he had decided that he "didn't have a future at Houlton Sector" and was pursuing other options. *Id.* 325:13-14. Mr. Deslauriers decided to try to move to a new organization within Homeland

Security called the Office of Air and Marine and, to this end, sought to gain additional marine experience. *Id.* 326:1-5. In February 2006, Mr. Deslauriers applied and was accepted as a member of a formal marine unit that was forming at the Calais station. *Id.* 326:9-13. On July 19, 2008, Mr. Deslauriers laterally transferred to the Office of Air and Marine in Florida. *Id.* 327:4-9. In August 2009, he became a GS-12. *Id.* 327:16.

## II. DISCUSSION

### A. Failure to Promote

The Age Discrimination in Employment Act (ADEA) "prohibits employers from taking adverse employment actions against employees older than 40 because of their age." *Arroyo-Audifred v. Verizon Wireless, Inc.*, 527 F.3d 215, 218 (1st Cir. 2008) (citing *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007)). In *Gross v. FBL Financial Services*, 129 S. Ct. 2343 (2009), the Supreme Court clarified the standard for an ADEA claim: "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Id.* at 2352. The *Gross* Court emphasized that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.*

Following *Gross*, the First Circuit in *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441 (1st Cir. 2009), clarified that the three stage burden-shifting

*McDonnell Douglas Corp. v. Green* framework remains applicable for ADEA claims absent direct evidence of discrimination:

> As with other kinds of employment discrimination cases, however, ADEA plaintiffs rarely possess smoking gun evidence to prove their employer's discriminatory motivations. There will seldom be eyewitness testimony to the employer's mental processes. ADEA plaintiffs who do not have smoking gun evidence may nonetheless prove their cases by using the three stage burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green.*

*Id.* at 446-47 (citations and internal quotations omitted).[3] The *Velez* Court succinctly reiterated the respective burdens for ADEA claims under *McDonnell Douglas*. To establish a prima facie case, the plaintiff must show: 1) that he was at least 40 years old at the time he was not promoted; 2) that he was qualified for the position; 3) that he was not promoted; and, 4) that the employer subsequently filled the position with a younger person of similar qualifications.[4] *Id.* at 447. The First Circuit has consistently described "this prima facie showing as 'modest' and a 'low standard.'" *Id.* (citations omitted). Once the ADEA plaintiff makes a prima facie showing, he is entitled to "a presumption of age-based discrimination." *Id.*

The burden of production shifts to the employer to "articulate a legitimate, non-discriminatory reason for its decisions." *Id.* (citation omitted). As the First Circuit has stated, an employer's obligation at this stage "entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains

---

[3] The First Circuit observed that it will continue to apply the *McDonnell Douglas* framework "[u]ntil told otherwise by the Supreme Court." *Velez*, 585 F.3d at 447 n.2.

[4] *Velez* involved discriminatory discharge, not failure to promote. To arrive at this formulation, the Court combined *Velez* and *Arroyo-Audifred v. Verizon Wireless, Inc.*

the claimant's at all times." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991). Once the employer comes forward with such a reason, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Velez*, 585 F.3d at 447 (citation omitted).

If the employer meets that burden of production, the sole remaining issue becomes "discrimination *vel non*." *Id.* A plaintiff must "be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 447-48 (citation and internal quotation marks omitted). Following *Gross*, the plaintiff's burden at this final stage is to prove "that age was the 'but-for' cause of the employer's adverse action." *Id.* at 448.

## 1. Prima Facie Case

Mr. Deslauriers easily meets his prima facie case. Mr. Deslauriers was over forty at the time of the alleged discrimination. Ex. 101. He was qualified for the position and was denied the promotion. *Tr.* 93:1-10. The successful candidate, Mr. Podschlne, was younger, Ex. 101, and had similar qualifications. *Tr.* 93:1-10.

The Government gives two reasons for why Mr. Deslauriers cannot make out his prima facie case. First, it argues that an inference of age discrimination cannot be made when the successful candidate is not "substantially younger" than the worker denied the position. *Def.'s Proposed Findings of Fact and Conclusions of Law* at 34 (Docket # 121) (*Def.'s Mem.*) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)). Because Mr. Podschlne is only 5 1/2 years

younger than Mr. Deslauriers, the Government urges the Court to conclude that the age difference "does not meet the minimum legal threshold for raising an inference of age discrimination." *Id.* at 35.

In *O'Connor v. Consolidated Coin Caterers Corp.*, a 56-year-old employee sued under the ADEA after he was fired and replaced by a younger employee. *O'Connor*, 517 U.S. at 309. The Fourth Circuit held that the employee failed to make out a prima facie case of discrimination because the younger employee was not outside the protected class. *Id.* at 310. In reversing the Court of Appeals, the Supreme Court emphasized that the prima facie case is focused on whether the person within the protected class was discriminated against on the basis of age, not on whether the ADEA plaintiff was replaced by someone outside the protected class. *Id.* at 312. Thus, the Supreme Court concluded that whether "a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.* at 313.

In applying *O'Conner*, the First Circuit interprets its "substantially younger" language to mean "that an age difference of less than five years is insufficient to support a prima facie case of age discrimination." *Williams v. Raytheon Co.*, 220 F.3d 16, 20 (1st Cir. 2000) (holding that a three year age difference is "too insignificant" to support a prima facie case of age discrimination). Although some Circuits require a greater age difference, the First Circuit does not. *Compare Williams*, 220 F.3d at 20, *with Girten v. McRentals, Inc.*, 337 F.3d 979, 981 (8th Cir.

2003) (questioning whether a nine year age difference is sufficient); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003) (stating that six years is insufficient absent direct evidence of discrimination); *and Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir. 1998) (finding that a seven year age difference did not create an inference of age discrimination).  Because Mr. Podschlne was more than five years younger than Mr. Deslauriers, under First Circuit law, their age difference supports an inference of discrimination.

Second, the Government argues that to make out a prima facie case of age discrimination, "the Plaintiff must demonstrate that the decision-makers knew the applicants' ages." *Def.'s Mem*. at 35 (citing *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 87 (2d Cir. 2005)).  Because "neither the deciding official (Matthew Zetts) nor the recommending official (Roland Richardson) knew the applicants ages," the Government concludes that Mr. Deslauriers failed to satisfy the minimum legal threshold for an age claim.  *Id.* at 36.  According to the Government, knowledge cannot be imputed from information contained on the applications: Mr. Deslauriers' high school graduation date is meaningless because there is no evidence that the decision-makers used it to calculate his age and no high school graduation date was included on Mr. Podschlne's application.  *Id.*  The Government further argues that even if the officers discriminated against Mr. Deslauriers based on time in service, "there is no discrimination even if the motivating factor (such as pension status) is correlated with age."  *Id.* (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611

(1993)).  Regardless, the Government contends that time in service is not related to age because agents join the Border Patrol at different ages.  *Id.* at 37.

In *Woodman*, the plaintiff, citing *O'Conner*, argued that the defendant's knowledge of the plaintiff's relative age to the successful candidate is irrelevant at the prima facie stage and that courts can infer knowledge when a significantly younger employee replaces a plaintiff.  *Woodman*, 411 F.3d at 80.  Rejecting this interpretation of *O'Conner*, the Second Circuit found that, like the vast majority of cases to deal with the ADEA, the employer in *O'Conner* knew the ages of the employees.  *Id.*  Instead, the *Woodman* Court found that the "presumption" that arises from establishment of a prima facie case is not raised without some evidence that an employer knew that it was replacing an older worker with a younger one.  *Id.* at 81 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) (defining the "presumption" as a required conclusion of discrimination in the absence of explanation)).  Quoting *Geraci v. Moody-Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir. 1996), the *Woodman* Court concluded, "[I]t is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant." *Woodman*, 411 F.3d at 81.  In the absence of First Circuit case law on the issue, the Court follows the persuasive reasoning in *Woodman* and finds that knowledge is a part of the fourth prong of a prima facie ADEA case.  *See Montalvo-Leon v. Wyeth Pharm. Co.*, Civil No. 05-1236 (DRD), 2007 WL 2905350, at *21 (D. P.R. Sep. 24, 2007) (citing *Woodman* for conclusion that employer knowledge of age discrepancy is required for a prima facie ADEA case).

Like the other elements in a prima facie case, however, the evidence needed to establish knowledge is "minimal." *Woodman*, 411 F.3d at 83. In *Woodman*, the Second Circuit concluded that "direct proof" was not needed to prove an employer's knowledge. *Id.* Not only can knowledge be established through circumstantial evidence but also "in drawing inferences of knowledge from circumstantial evidence, a fact finder is not required to operate in an experiential vacuum." *Id.* at 83-84. The factfinder is expected to "draw on the full range of his reason, experience, and common sense." *Id.* at 84.

Although both Mr. Richardson and Mr. Zetts stated that they did not know the ages of Mr. Deslauriers and Mr. Podschlne and did not calculate a rough estimate based on dates contained in their applications, the Court readily finds knowledge based on circumstantial evidence. The Court observed at trial that Mr. Deslauriers looks and acts much older than Mr. Podschlne. The Court agrees with Mr. Gayton's testimony that not knowing the actual ages of the two men would cause an observer to overestimate, not underestimate, the age difference. *Tr.* 49:21-23. Because both Mr. Richardson and Mr. Zetts interacted with the two men before the hiring decision, the Court concludes they knew that Mr. Podschlne was substantially younger than Mr. Deslauriers.[5] Mr. Deslauriers made out a prima facie case of age discrimination.

### 2. Legitimate Non-Discriminatory Reason

---

[5] Although Mr. Richardson was not present at Mr. Deslauriers' interview, he knew Mr. Deslauriers professionally. *See*, *e.g.*, *Tr.* 287:24-288:8.

The Border Patrol can rebut this inference by "articulat[ing] a legitimate, non-discriminatory reason for its decisions." *Arroyo-Audifred*, 527 F.3d at 219 (citing *Currier v. United Techs. Corp.*, 393 F.3d 246, 254 (1st Cir. 2004)). It has. The Border Patrol asserts that Mr. Podschlne was selected based on his superior writing skills. *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004) (recognizing superior qualifications as a legitimate reason for an employer's decision). Mr. Zetts and Mr. Richardson both testified that Mr. Podschlne was selected based on the slightly superior quality of his intelligence reports. *Tr.* 92:10-94:13, 463:10-22. Mr. Sill, Mr. Richardson, and Mr. Zetts all testified that they thought Mr. Podschlne's reports were better. *Id.* 93:1-10, 94:6-13, 464:7-12. Mr. Richardson called Mr. Deslauriers shortly after the selection and told him that Mr. Podschlne was selected based on his writing skills. *Id.* 149:12-21. Furthermore, report writing is an important part of a LPBA's duties. *See, e.g., id.* 77:16-78:7, 207:17-23, 354:2-11, 540:10-17.

Mr. Deslauriers responds that the Government's asserted explanation is not believable because the LBPA job posting did not include writing skills as an important part of the position and there is no credible testimony that a thorough review of the written reports was made. *Pl.'s Proposed Findings of Fact and Conclusions of Law* at 30-31 (Docket # 128) (*Pl.'s Mem.*). However, the believability of the legitimate reason is relevant to the question of pretext, *see infra* Part II.A.3, not whether the reason itself is a legitimate one. *Cf. Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (addressing weaknesses in the

employer's legitimate reason in the context of pretext). The Border Patrol has satisfied the second-prong of the *McDonnell Douglas* test.

### 3. Pretext

Because the Border Patrol sustained its burden of production to establish a legitimate nondiscriminatory reason for its promotion decision, Mr. Deslauriers must produce evidence that its proffered reasons are a pretext for age discrimination. *Hoffman v. Applicators Sales and Serv. Inc.*, 439 F.3d 9, 18 (1st Cir. 2006) (affirming summary dismissal because "no factfinder could rationally conclude from the record . . . that the termination—whatever its precise motivation—was motivated by [age] discrimination"). Mr. Deslauriers makes five arguments for why the Border Patrol's reason is pretextual: Mr. Deslauriers was more qualified; there were irregularities in the interview process; Mr. Podschlne was pre-selected for the position; the reason proffered is implausible, inconsistent, and incoherent; and statistical evidence supports a claim of age discrimination. Taken together, Mr. Deslauriers contends the Court must find that "but for Deslauriers age, he would have been selected for the LBPA position in Calais." *Pl.'s Mem.* at 40.

### a. Qualifications

When an employer claims to have promoted one person over another based on qualifications, "the question is not which of the aspirants was better qualified, but, rather, whether the employer's stated reasons for selecting one over the other were pretextual." *Rathbun*, 361 F.3d at 74. In line with the business judgment rule,

"[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Mesnick*, 950 F.2d at 825. Because "[q]ualifications are notoriously hard to judge," "an unwise personnel decision" does not necessarily indicate discrimination. *Rathbun*, 361 F.3d at 74; *accord Keyes v. Sec'y of Navy*, 853 F.2d 1016, 1024-26 (1st Cir. 1988); *Gray v. New Engl. Tel. & Tel. Co.*, 792 F.2d 251, 255 (1st Cir. 1986); *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1341 (1st Cir. 1988). The First Circuit has cautioned that evidence of competing qualifications "seldom provides a principled way for a factfinder to determine whether a given employment decision, even if wrong-headed, was anything other than 'a garden variety mistake in corporate judgment.'" *Rathbun*, 361 F.3d at 74 (quoting *Freeman*, 865 F.2d at 1341)).

The First Circuit does recognize that in "a rare case," a plaintiff may be able to prove pretext based on superior qualifications. *Id.* (citations omitted). However, the First Circuit emphasizes that the difference in qualifications must be "stark" and that, "in the absence of strong objective evidence (e.g., test scores), . . . will seldom, in and of itself, be sufficient to create a triable issue of pretext." *Id.* (citing *Deines v. Tex. Dep't of Protective and Regulatory Serv*s., 164 F.3d 277, 282 (5th Cir. 1999) (stating that superior qualifications only suggests pretext in extreme cases where qualifications are "so widely disparate that no reasonable employer would have made the same decision")).

Mr. Deslauriers makes two arguments for why he is more qualified than Mr. Podschlne. First, he contends that he has more training, awards, and experience

than Mr. Podschlne. *Pl.'s Mem.* at 32-33. Much of what Mr. Deslauriers contends are his superior qualifications, however, are based on his assessment, not the Border Patrol's. On cross-examination, Mr. Deslauriers' lawyer pressed Mr. Zetts to admit that Mr. Deslauriers had received more training than Mr. Podschlne. *Tr.* 491:13-492:4. Instead, Mr. Zetts distinguished between training and relevant intelligence training, stating "some of [Mr. Deslauriers'] training is good border patrol agent training. Some of it is not relevant to the position of lead border patrol agent. He did receive more training, yes." *Id.* 491:18-23. Similarly, when Mr. Deslauriers' lawyer cross-examined Mr. Richardson, the Border Patrol agent answered generally: the attorney asked whether prescription drug diversion training was relevant to the LBPA position and the agent answered "Could have been, yes." *Id.* 117:13-118:3. Relevance is a low bar, however, and the Court is not in a position to second guess what qualifications the Border Patrol values.

More fundamentally, the Court is not convinced that the Border Patrol placed a high value on superior qualifications. The Border Patrol looked at qualifications initially to select the top two candidates. *Id.* 88:4-7. Once identified, however, the Border Patrol based the actual selection on the agent's performance in the interview and as acting LBPA, using the agent's report writing as a tie breaker. By asserting that the Border Patrol overlooked Mr. Deslauriers' superior qualifications, Mr. Deslauriers essentially asks the Court to find that the Border Patrol erred in assigning more weight to performance than to the training, details, and experiences on Mr. Deslauriers' résumé. Although the Border Patrol could have used the

agents' applications as a tie breaker, it did not. It is difficult to strike the balance between experience and performance and the Border Patrol's emphasis on performance falls squarely within the sweep of the business judgment rule.

Second, Mr. Deslauriers contends that Mr. Deslauriers is more qualified based on the Border Patrol's own measuring stick. *Pl.'s Mem.* at 34. Mr. Deslauriers emphasizes that he alone served as the collateral intelligence agent at the Calais station in 2004 and he served longer as acting LBPA than Mr. Podschlne. *Id.* at 33-34. He also summarizes the praise he received from Mr. Sill and Mr. Gayton for his intelligence reports and compares it to some unhelpful intelligence developed by Mr. Podschlne. *Id.* at 34. Mr. Deslauriers overlooks, however, the testimony from Mr. Sill that positive feedback was part of his management style and that he gave similar compliments to Mr. Podschlne. *Tr.* 541:7-18, 541:22-542:2. Furthermore, Mr. Deslauriers received the compliments before Mr. Podschlne provided a point of comparison. Mr. Sill testified that although Mr. Deslauriers had written good reports, after he read Mr. Podschlne's, he recognized that they were better. *Id.* 542:11-21. Mr. Gayton's preference for Mr. Deslauriers carries less weight because he testified that his preference was only minimally based on Mr. Deslauriers' written work, the standard employed by the Border Patrol. *Id.* 38:3-11. To accept Mr. Gayton's opinion would be to endorse his view that intelligence contacts are more important than writing for the LBPA position. This type of judicial second-guessing is forbidden by the First Circuit. *Mesnick*, 950 F.2d at 825 (warning courts not to act as "super personnel departments"). Mr. Zetts valued Mr.

Podschlne's writing style more highly than Mr. Deslauriers' more extensive intelligence experience and the Court defers to this business judgment.

### b. Hiring Irregularities

The First Circuit recognizes that "[d]eviation from established policy or practice may constitute evidence of pretext." *Boyajian* v. *Starbucks Corp.*, 587 F. Supp. 2d 295, 306 (D. Me. 2008) (citing *Kouvchinov* v. *Parametric Tech. Corp.*, 537 F.3d 62, 68 (lst Cir. 2008)). Mr. Deslauriers alleges multiple hiring irregularities: the failure to conduct a full KT; the placement of Mr. Podschlne on the noncompetitive list; the production of the partial KT after having initially stated it did not exist; the non-participation of Mr. Richardson in Mr. Deslauriers' interview; the differences in questions asked at the interviews; and the failure to ask for and disregard of Mr. Gayton's opinion. *Pl.'s Mem.* at 35-36.

The discrepancies identified by Mr. Deslauriers do not constitute evidence of pretext. The lack of a full KT was not necessarily an irregularity; Mr. Zetts testified that he did not always use a KT and sometimes selected candidates without it. *Tr.* 471:4-25. Furthermore, because the KT was only used to select which candidates to interview, it is unclear how the lack of a full KT harmed Mr. Deslauriers, who was interviewed. *Id.* 88:4-7. Although Mr. Zetts was wrong when he initially testified that the partial KT was destroyed, he had made a reasonable assumption when he was unable to locate it based on Border Patrol policy. *Id.* 459:8-23. Although Mr. Richardson was missing from Mr. Deslauriers' interview, the decision-maker, Mr. Zetts, was present, and not every interviewer attended every interview. *Id.* 91:3-12,

139:6-25, 140:5-18. Differences between the questions posed to Mr. Deslauriers and Mr. Podschlne were consistent with the LBPA interview process: both were asked the same seven questions and each was asked a few unique ones. *Id.* 142:15-23; Exs. 37, 38. Finally, not soliciting Mr. Gayton's opinion was not a deviation from normal hiring policy. Although the Border Patrol "usually" asked Mr. Gayton for a recommendation, it had done so because he had traditionally been the direct supervisor of the candidates. *Tr.* 44:6-12. In-line with the practice of asking for a recommendation from the direct supervisor, Mr. Richardson asked Mr. Sill for his recommendation. *Id.* 92:11-20. Because the separate intelligence chain of command was new, the LBPA selection was one of the first promotions in which the opinion of an intelligence supervisor was more relevant than the opinion of the station's PAIC.

Although it is unclear how the one true irregularity—Mr. Podschlne's misplacement on the noncompetitive list—occurred, the mistake originated in Washington, not in Calais. *Steiner Decl.* ¶¶ 4-5. Furthermore, it is unclear how the irregularity harmed Mr. Deslauriers. He was given an interview and was considered as competitive a candidate as Mr. Podschlne. *Tr.* 89:18-90:11, 92:10-11, 456:7-22. Finally, there is no evidence that the selecting officials believed that Mr. Podschlne was at a higher pay-scale. Mr. Zetts stated that "[the selection officials] knew all the candidates. They all had at least two years experience in Houlton sector." *Id.* 472:7-16. Such familiarity makes it likely that the selecting officials recognized Mr. Podschlne's placement on the noncompetitive list as a mistake.

### c. Preselection

Preselection of a candidate alone does not violate the ADEA when it is "based on the qualifications of the preselected party." *Goostree v. State of Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986); *accord Kennedy v. Landon*, 598 F.2d 337, 341 (4th Cir. 1979). However, some circuits find that preselection is relevant to the employer's motivations and "operates to discredit the employer's proffered explanation for its employment decision." *Goostree*, 796 F.2d at 861; *see also Ham v. Washington Suburban Sanitary Comm'n*, 158 Fed. Appx. 457, 470 (4th Cir. 2005) (stating that preselection can support a finding of pretext in conjunction with other evidence); *Coble v. Hot Springs Sch. Dist. No.6*, 682 F.2d 721, 728-29 (8th Cir. 1982) (finding that evidence of preselection discredited the school district's proffered legitimate explanation). Mr. Deslauriers contends that Mr. Podschlne was preselected because only a partial KT was performed when a full KT would have revealed Mr. Deslauriers as the better candidate, because Mr. Gayton's opinion that Mr. Deslauriers was a superior candidate was not solicited, because Mr. Podschlne was asked different hypothetical questions than Mr. Deslauriers at the interview, and because a third qualified candidate, Mr. Whittaker, was not afforded an interview. *Pl.'s Mem.* at 36-37.

The evidence does not establish preselection. The Court cannot predict the result of a full KT. Although Mr. Deslauriers urges the Court to accept the KT matrix as the same or similar to the full KT that would have been performed, both Mr. Richardson and Mr. Zetts testified that they were unfamiliar with the form. *Tr.*

104:15-105:3, 476:3-5. Without evidence of its origin, the Court gives it little weight. Furthermore, there is also no evidence that either Mr. Richardson or Mr. Zetts knew that a full KT would favor Mr. Deslauriers. Absent such knowledge, their reason to not perform one is unrelated to favoritism. Similarly, there is also no evidence that Mr. Gayton was not asked for his opinion because he favored Mr. Deslauriers or that Mr. Richardson knew which candidate Mr. Gayton favored. Mr. Richardson testified that he asked Mr. Sill for his opinion because he valued it as the intelligence supervisor and that he found Mr. Gayton's opinion as PAIC less valuable. *Id.* 92:11-20, 151:4-10. The Court has no reason to second-guess Mr. Richardson. Finally, the Court is unsure how asking different questions of the candidates and not interviewing Mr. Whittaker shows that Mr. Podschlne was preselected: there is no connection between the specific questions and preselection; and not giving Mr. Whittaker an interview indicates, at best, the preselection of Mr. Podschlne *and* Mr. Deslauriers, not Mr. Podschlne alone.

### d. Weaknesses in Legitimate Reason

Mr. Deslauriers can establish pretext "by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions *in the employer's proffered legitimate reasons* such that a factfinder could infer that the employer did not act for the asserted nondiscriminatory reasons." *Carreras v. Sajo, Garcia & Partners,* 596 F.3d 25, 37 (1st Cir. 2010) (quoting *Santiago-Ramos*, 217 F.3d at 56). However, the First Circuit is clear that minor discrepancies in explanations do not qualify because "[o]ur laws are designed to ensure against discrimination and

retaliation, not 'inaccuracy by an employer.'" *Id.* (quoting *Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 535 (1st Cir. 2002)).

Mr. Deslauriers points out four "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the reasoning behind the Border Patrol's selection. First, Mr. Deslauriers contends that the only concrete example of a superior intelligence report by Mr. Podschlne was one based on an investigation initiated by Mr. Deslauriers and was more like an "after-action report than an intelligence report." *Def.'s Mem.* at 37-38. However, Mr. Sill still found Mr. Podschlne's report valuable because "he went further into the intelligence report that he produced." *Tr.* 569:17-20. Furthermore, he was using the report as an example of the writing he preferred, not of a better intelligence report. *Id.* 569:1-3. At most, the report demonstrates that Mr. Sill was wrong in his assessment, not that his underlying reason was wrong. Even if he based his recommendation on an initial impression later proved wrong, it indicates a bad hiring decision not a pretextual one.

Second, Mr. Deslauriers contrasts Mr. Zetts' statement in his EEOC declaration that he had selected Mr. Podschlne in part because of his better education with his admission at trial that the two candidates had basically the same education. *Def.'s Mem.* at 37-38. Although Mr. Zetts was mistaken about Mr. Podschlne's education, it does not make him mistaken about Mr. Podschlne's writing ability.

Third, Mr. Deslauriers finds additional inconsistencies in the contrast between Mr. Richardson's disparaging comments about Mr. Deslauriers' intelligence reports in his EEOC declaration and his and Mr. Sill's admissions that some of Mr. Deslauriers' reports were good. *Id.* at 38. Mr. Sill and Mr. Richardson both testified that although Mr. Deslauriers did good work, Mr. Podschlne's work was better. *Tr.* 93:1-10, 544:17-25. This inconsistency does not, however, reveal pretext.

Fourth, Mr. Deslauriers argues that the Border Patrol's contradictory and inconsistent statements about the intelligence reports support the conclusion of pretext. *Def.'s Mem.* at 38. The Court does not draw the same significance from inconsistencies in the testimony about the review process. The selection decision occurred in 2005 and five years later some memory gaps are understandable. Although Mr. Sill did not re-review the intelligence reports before he told Mr. Richardson that Mr. Podschlne was a better writer, he based his decision on the assessment he had already made when reviewing the reports as intelligence supervisor. *Tr.* 567:3-14. Mr. Sill recommended Mr. Podschlne to Mr. Richardson who in turn recommended Mr. Podschlne to Mr. Zetts. *Id.* 94:6-13, 94:24-95:6. Mr. Richardson and Mr. Zetts testified that they did some minimal independent review but both essentially confirmed Mr. Sill's opinion. *Id.* 93:24-94:3, 464:7-8. Mr. Richardson told Mr. Deslauriers only a few weeks after the selection decision that it was made based on Mr. Podschlne's writing skills. *Id.* 150:4-8. Although the

selection process relied heavily on Mr. Sill's subjective preference for Mr. Podschlne's reports, it does not make the hiring decision pretextual.

### e. Statistical Evidence

"[S]tatistical evidence showing disparate treatment by the employer of members of the protected class" can prove that a legitimate hiring reason was pretextual. *Mesnick*, 950 F.2d at 824; *see also Booker v. Mass. Dep't of Pub. Health*, 527 F. Supp. 2d 216, 226 (D. Mass. 2007) (stating that in proving pretext, "the full panoply of circumstantial evidence is available, including but not limited to statistical evidence showing disparate treatment by the employer of members of the protected class"); *Boyajian*, 587 F. Supp. 2d at 307-08 (finding that plaintiff survived summary judgment based on employer's conduct during and after the interview and the employer's hiring data). The First Circuit warns, however, that statistical evidence standing alone is rarely sufficient to prove pretext because "a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when [deciding whether to promote] a particular individual." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993). The Court in *Leblanc* concluded that statistics, alone, likely do not show that an employer's decision was impermissibly based on age "[w]ithout an indication of a connection between the statistics, the practice of the employer, and the employee's case." *Id.* (internal quotation marks omitted). The usefulness of hiring data is further undermined when other explanations for the results are not

eliminated, such as random choice and the distribution of aptitudes and experience among employees of different ages. *Boyajian*, 587 F. Supp. 2d at 308.

No statistical significance can be drawn from the selection of the LBPAs. In four of the six stations in the Houlton sector, no candidates over forty applied for the position. Ex. 39. In Calais, Mr. Wittaker, the other candidate over forty who applied for the LBPA position, had intelligence experience but had not served as an acting LBPA. Ex. 31. Although not a prerequisite for becoming an LBPA, all the LBPAs selected had served as an acting LBPA. *Tr.* 547:17-548:9. Furthermore, with only the ages of the LBPA candidates from other stations, the Court cannot eliminate other explanations for the hiring decisions.

There is also no evidence of an age-based hiring pattern in non-LBPA selections. When all the non-LBPA promotion selections are considered, half of the selected candidates were above the age of forty and half below. Ex. 102. Mr. Deslauriers asks the Court to edit this number to only include those positions he characterizes as most similar to the LBPA position, but he does not explain why the Border Patrol would discriminate based on age for only those positions most similar to the LBPA. *Pl.'s Mem*. at 39. Regardless, because information is only provided about the successful candidates, other explanations for the hiring decisions cannot be eliminated. The record does not reveal whether any candidates over forty applied for any one opening or the qualifications of those agents over forty who did apply.

### 4.    Conclusion: Imperfect But Not Discriminatory

Mr. Deslauriers has not met his burden of proving that the Border Patrol's legitimate reason for selecting Mr. Podschlne is pretextual. Nevertheless, certain aspects of the Border Patrol's promotion process were imperfect and gave an impression of unfairness, which taken together, gave Mr. Deslauriers reason to suspect that the true basis for the decision was improper.

First, even though the age difference between Mr. Deslauriers and Mr. Podschlne was not numerically large, during their testimony at trial, Mr. Deslauriers, who is reserved, both looked and acted older than Mr. Podschlne, who appears younger and more exuberant. Mr. Gayton testified that he at first thought the age difference between the two men was 12 or 15 years. *Id.* 49:21-23. He knew Mr. Deslauriers' age, having worked with him for many years, but he thought that Mr. Podschlne was in his 20s because "he looks young . . . he comes across young . . . he talks like somebody in their 20s . . . he's not very worldly." *Id.* 49:8-14.

Second, there was the still unexplained mistake in Washington inaccurately giving Mr. Podschlne a non-competitive slot. Even though the Border Patrol has assured Mr. Deslauriers that the Washington error made no difference, Mr. Deslauriers could be forgiven for not accepting the Border Patrol's representations.

Third, an appearance of unfairness was created when one the interviewers did not even show up at Mr. Deslauiers' interview and the Border Patrol made no effort to reschedule the interview. If the purpose of the interview is to allow the applicant to make an in-person pitch, the absence of an interviewer compromised Mr. Deslauriers' ability to make an in-person presentation to the full panel.

Furthermore, once Mr. Deslauriers learned that his application was unsuccessful and began to ask why, the absence of one of the interviewers was a logical place to start. Again, it is understandable that Mr. Deslauriers would not accept the Border Patrol's explanation that Mr. Richardson's absence made no difference, since he was, after all, a member of the interviewing panel and his opinion must have been valued. It also may have signaled to Mr. Deslauriers that the interview was insignificant because the promotion decision was preordained.

Fourth, the most non-transparent part of the Border Patrol's promotion process was that, in using report writing as the tie-breaker, the decisionmakers applied subjective and unknown standards to the quality of the reports. It is true that Agents Deslauriers and Podschlne were on notice that one of the Border Patrol's criteria was report writing and that, in a close case, the Border Patrol was within its rights to use the quality of the candidates' report writing as a tie breaker.

At the same time, this part of the promotion process was opaque. The Border Patrol agents were never told which writing style the Border Patrol preferred and, as it turns out, the decision-makers applied subjective criteria retroactively to the quality of the reports. For example, Mr. Zetts testified that Mr. Podschlne wrote "more detailed, relevant reports," *tr*. 464:11-12; yet, Mr. Richardson described Mr. Podschlne's reports as "more concise and to the point." *Id*. 94:9-10. It is difficult to understand how Mr. Podschlne's reports could be simultaneously "more detailed" and "more concise", and it seems that Mr. Zetts and Mr. Richardson were applying different standards.

One criticism of Mr. Deslauriers' report writing was that that his reports were more like police reports than intelligence reports. Mr. Sills described the difference:

> Typically a police report is something that describes a situation, an occurrence, an incident, and it talks to the standard facts, the who, what, where, when, and how. An intelligence report goes deeper. It explains those things but then goes into history, it goes into connections, connectivity to other circumstances, and delineates all of that.

*Id.* 561:24-562:5. Although Mr. Sills testified that he had been "impressed with some of Agent Deslauriers' reports," *id.* 561:3-4, he also said that when compared to Mr. Podschlne's reports, Mr. Deslauriers' reports were more like police reports than intelligence reports. *Id.* 563:22-564:1. Mr. Richardson applied another standard to the reports: whether "they would be very easy to read by an outside agency." *Id.* 94:9-13.

What seems to have happened is that once the two candidates were deemed very close, Mr. Zetts decided to use report writing as the tie breaker. Because this factor assumed critical significance late in the process, neither Mr. Deslauriers nor Mr. Podschlne was asked about their report writing during their interview. As it turns out, Mr. Deslauriers had an explanation for why his reports were more like police reports, but the decision-makers never heard it.

As the first acting LBPA, Mr. Deslauriers was required to "start the unit from the ground up," *tr.* 268:18-19, and he initiated many "face to face" contacts. *Id.* 268:22. For example, he personally visited "all the local police departments." *Id.* 269:23-24. Although he became involved in some investigations, his primary duty,

as he viewed it, was to make the contacts that would bear investigative fruit in the future. In writing his reports, Mr. Deslauriers was concerned about releasing confidential information, particularly in drug cases, to the long list of official recipients, for fear of compromising his sources. *Id.* 274:9-18. Furthermore, although Mr. Deslauriers was aware of the difference between police reports that convey the facts and intelligence reports that piece together information, he could not recall ever having had the purpose of his reports "clearly delineated." *Id.* 273:14-15. To this point, Mr. Sills admitted that he had never told Mr. Deslauriers that he needed to provide more detail in his intelligence reports, that they were too much like police reports, or that his written reports were deficient in any way. *Id.* 564:7-22.

By contrast, Mr. Podschlne had the advantage of the groundwork that Mr. Deslauriers had laid for the intelligence unit and he was able to give more attention to the written reports, providing more context and narrative. In Mr. Podschlne's words:

> I collected as much information as I possibly could from many different sources - - these sources to include human intelligence, confidential informants, pocket trash on arrested folks, other agencies - - and - - and I compiled that information, I analyzed it, and I produced a document analyzing that threat. And at that point, I'd disseminate that information through the chain of command so that they had the most up-to-date information possible to make determinations on combating the threat.

*Id.* 206:4-12. Comparing their testimony, Mr. Podschlne viewed the preparation of the written report as more central to his work as an LBPA.

It was Mr. Podschlne's good fortune that, in breaking a tie between the candidates, the decision-makers chose an area of LBPA duties that ran to his strength. If they had elected to emphasize contacts in the field and face-to-face meetings with local police officers, Mr. Deslauriers would have looked better and may have won the job. Furthermore, when the decision-makers reviewed Mr. Podschlne's reports, because they were more detailed than Mr. Deslauriers', they were able to better understand their substance and preferred them. Whether, if they had asked, the decision-makers would have accepted Mr. Deslauriers' explanation about his report writing style cannot be known, but they did not ask.

There is no evidence that the decision-makers measured the quality of the writing against a Border Patrol stylebook on written reports or any other objective standard. If the Border Patrol had informed the agents that their report writing was going to be measured against a certain style manual or its ease of comprehension by a person unfamiliar with the unit's activities, the agents would have been on notice and their ability to conform with expected standards would be fairly judged. But, neither Mr. Podschlne nor Mr. Deslauriers knew anything about these standards because there were none. It was mostly happenstance that the decision-makers preferred Mr. Podschlne's report writing over Mr. Deslauriers' report writing.

Finally, the Border Patrol favored a positive management style, which is certainly beneficial, but has the unintended effect of lulling agents into a false sense

of confidence in their performance. More particularly, as evidenced in this case, the uncritical approach does not give agents an opportunity to improve.

All these factors led to an employment decision that was an unpleasant surprise to Mr. Deslauriers. The key factor in the selection process—report writing—was subjective, undisclosed, and determinative. From the Court's perspective, it is understandable that Mr. Deslauriers perceived the result as unfair, became disgruntled, and concluded that the explanation must have been grounded in the impermissible criterion of age. Nevertheless, imperfections in an employment process do not amount to age discrimination under the ADEA if the imperfections are not based on age. Here, Mr. Deslauriers has demonstrated that the Border Patrol's promotion process was flawed, but not that it was discriminatory.[6]

## B.    Retaliation

Mr. Deslauriers also claims that the Border Patrol retaliated against him for filing his ADEA claim by not assigning him to the Situation Room detail. *Compl.* at 6 (Docket # 1). The ADEA protects individuals who invoke its protection. 29 U.S.C.

---

[6] To be clear, the Court here is making no comment on Mr. Podschlne's qualifications, only upon the Border Patrol process. If the selection process had been more transparent, if the standards had been clear, and if the Border Patrol had been more conscious of the importance of the appearance of fairness, Mr. Podschlne might well still have ended up as the successful candidate. Both Mr. Podschlne and Mr. Deslauriers are good agents and have served this Country honorably and well. The Court's concern is the quality of the selection process, not the quality of the two men.

There is a lesson here for the Border Patrol: unless its promotion process is scrupulously fair and transparent, it will continue to send unintended signals to good employees like agents Podschlne and Deslauriers when they are unsuccessful in competitive employment decisions. The Court is convinced that none of the three Border Patrol supervisors, Mr. Zetts, Mr. Richardson, and Mr. Sills, set about to devise and carry out a flawed selection process. However, by making an ad hoc decision to elevate report writing over all other qualifications, by applying subjective standards to the report writing, and by never informing the candidates that report writing would make a critical difference, the decision-makers inadvertently created an appearance of unfairness that lingered and resulted in the initiation of this legal action.

§ 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."). As in the ADEA, where there is no direct evidence of retaliation, the First Circuit applies the *McDonnell Douglas* burden-shifting framework. *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 472 (1st Cir. 2010); *Ramírez Rodríguez v. Boehringer Ingelheim Pharms. Inc.*, 425 F.3d 67, 84 (1st Cir. 2005) ("Where there is no direct evidence of retaliation, our analysis of a claim under § 623(d) closely tracks the *McDonnell Douglas* framework.").

### 1.　　Prima Facie

To establish a prima facie case of retaliation, Mr. Deslauriers must show that 1) "he engaged in ADEA-protected conduct"; 2) "he was thereafter subjected to an adverse employment action"; and, 3) "a causal connection existed between the protected conduct and the adverse action." *Mesnick*, 950 F.2d at 827. Mr. Deslauriers meets the first prong of the prima facie case with his filing of an EEOC complaint. *See Sabinson v. Trs. of Dartmouth Coll.*, 542 F.3d 1, 3-4 (1st Cir. 2008) (stating without discussion that EEOC complaint was protected conduct). The Government contends that Mr. Deslauriers cannot meet the other two prongs because "the denial of the Situation Room detail was not an adverse action . . . and there is no causal connection between the protected activity and the denial of the Situation Room detail." *Def.'s Mem.* at 45.

The test for whether an employment action is adverse is whether the action "might have dissuaded a reasonable employee from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations and citation omitted). In *Burlington Northern*, Sheila White was hired as a track laborer, requiring her to remove and replace track components, transport track material, cut brush, and clear litter and cargo spillage from the right-of-way, but she was soon assigned to primarily operate the forklift. *Id.* at 57. After Ms. White complained to officials about sexual-harassment from her immediate supervisor, she was removed from her forklift duty and assigned only standard track laborer tasks. *Id.* at 58. Ms. White filed an EEOC complaint arguing that the reassignment constituted retaliation for her earlier complaint. *Id.* The employer railroad argued that the anti-retaliation provision was coterminous with Title VII's substantive antidiscrimination provision and was similarly limited to conduct that "affects the employees 'compensation, terms, conditions, or privileges of employment.'" *Id.* at 61 (quoting 42 U.S.C. § 2000e-2(a)(1)). Rejecting the railroad's argument, the Supreme Court found that whereas the goal of equal employment opportunities could be achieved by focusing on only the employer's actions that effect employment, an anti-retaliation provision "limited to employment-related actions would not deter the many forms that effective relation can take." *Id.* at 63-64. The Supreme Court upheld the jury verdict in favor of Ms. White because the circumstances of the case could have led "a jury [to] reasonably

conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id.* at 71.

In *Billings v. Town of Gafton*, 515 F.3d 39 (1st Cir. 2008), the First Circuit overturned summary judgment based on the test for material adversity described in *Burlington Northern*. In *Billings*, the former secretary to the Town Administrator alleged retaliation after she was transferred to a job as secretary in the Town's recreation department. *Id.* at 40-44. The district court granted summary judgment against the plaintiff because it found that the transfer "was not in substance a demotion and did not otherwise involve material changes in her work environment." *Id.* at 46 (quoting *Billings v. Town of Gafton*, 441 F.Supp.2d 227, 244 (D. Mass. 2006)). Instead, the First Circuit found that the plaintiff "came forward with enough objective evidence contrasting her former and current jobs to allow the jury to find a materially adverse employment action," including differences in prestige, contact with others, and required experience and qualifications. *Id.* at 53-54. Other circuits have applied the *Burlington Northern* test for material adversity to ADEA retaliation claims. *See, e.g., Brown v. Northside Hosp.*, 311 Fed. Appx. 217, 224 (11th Cir. 2009); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 201 (2d Cir. 2006).

Although a close question, the denial of the Situation Room detail constitutes a materially adverse employment action. Not all details are desirable, but some are highly coveted. *Tr.* 317:5-12. Nine people from the Calais station applied for the

Situation Room detail. Ex. 23. Although providing no tangible promotion or employment benefits, the location of the Situation Room increased the likelihood of interacting with senior Border Patrol officers. *Tr.* 182:8-19. There was also the chance of meeting agents from other sectors and reestablishing past connections. *Id.* 317:5-12. Denying a desirable detail placement is not the type of "normally petty slights, minor slights, and simple lack of good manners" the Supreme Court meant to exclude by requiring materiality. *Burlington N.*, 548 U.S. at 68; *Lockridge*, 597 F.3d at 472-73 (finding that office assignment could constitute retaliation).

Mr. Deslauriers has also shown causation. The First Circuit recognizes that "temporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" *Decaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (quoting *Mariani-Colon v. Dep't of Homeland Sec. ex rel Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007)). Although stating that the temporal proximity must be "very close," *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004), the First Circuit has found a three-month gap sufficient. *Mariani-Colon*, 511 F.3d at 224; *Speckin v. Nestle Waters N. Am. Inc.*, Civil No. 08-149-P-S, 2009 WL 465988, at *11 (D. Me. Feb. 24, 2009), *aff'd*, 2009 WL 905611 (D. Me. April 2, 2009 (stating that a lapse of two and three months could establish the requisite causal connection).

Here, Mr. Deslauriers filed his charge of discrimination with the EEOC on December 5, 2005. Ex. 14. Ms. Rogers was selected for the situation room detail in

February 2006, approximately two months after Mr. Deslauriers filed his charge. *Tr.* 196:17-197:3. Because the adverse employment action occurred within two months of the EEOC filing, Mr. Deslauriers has established a causal connection and meets his prima facie case.

### 2. Legitimate Reason

The Border Patrol has met its burden of asserting a legitimate non-discriminatory reason for the selection of Ms. Rogers. Mr. Astle asserted that Ms. Rogers was selected because the Border Patrol wanted to share the opportunity for out-of-sector details among the agents. *Id.* 169:9-14. Mr. Deslauriers concedes that this is a legitimate reason "to select someone other than Deslauriers for the situation room detail." *Def.'s Mem.* at 46.

### 3. Pretext

Because the Border Patrol provided a legitimate reason for its non-selection of Mr. Deslauriers, "the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for the challenged actions was in fact a pretext for retaliating." *Billings*, 515 F.3d at 55 (quoting *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 336 (1st Cir. 2005)). Mr. Deslauriers urges the Court to find pretext because "[a]pplying the factors that determine which employee is awarded a detail . . . clearly favor Deslauriers." *Pl.'s Mem.* at 47. He argues that he was more senior than Ms. Rogers and there was more of a demand for Ms. Rogers at the Calais station because of her recruitment training. *Id.* at 47-48. Furthermore, he contends that the Border

Patrol's goal in giving all agent opportunities to serve on out-of-sector details did not favor Ms. Rogers: both candidates had gone on a significant number of details and Ms. Rogers had been on a detail more recently than Mr. Deslauriers. *Id.* at 47. Finally, he urges the Court to find that Mr. Zetts' testimony lacks credibility because he "testified that he could remember virtually nothing about the selection and while conceding that he made the ultimate determination was evasive and vague about his role." *Id.* at 48.

Mr. Deslauriers essentially asks the Court to weigh the factors identified by the Border Patrol as relevant to detail selection and find that Mr. Deslauriers was more qualified. Although this type of second-guessing is difficult and disfavored in the context of merit-based employment decisions, it becomes incoherent in non-merit based contexts. The Border Patrol was given broad discretion to select agents for details. *Tr.* 164:16-165:2. Although the Border Patrol loosely considered certain factors in selecting the candidate, the critical factor in the selection varies depending on the context. *Id.* 164:1-15. Here, the Border Patrol picked Ms. Rogers because she had applied and not been selected for several details and had fewer total details than Mr. Deslauriers. *Id.* 169:4-170:1. The Court must not substitute its own business judgment on this decision, and there is no objective criteria by which it could. Mr. Deslauriers has failed to prove that the Border Patrol's legitimate reason for choosing Ms. Rogers is pretextual.

## III. CONCLUSION

The Court concludes that the United States Border Patrol did not discriminate on the basis of age when it did not promote Mr. Deslauriers to be the Lead Border Patrol Agent for the Calais station and did not retaliate against him when it selected another agent for the situation room detail. The Court GRANTS judgment against Jeffrey Deslauriers and in favor of Defendant United States of America.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 17th day of September, 2010